**In re LOIS/USA, INC., Lois/USA New York, Inc. Lois/USA Chicago, Inc. Debtors.**

**The Official Committee of Unsecured Creditors of Lois/Usa, Inc Lois/USA New York, Inc., Lois/USA Chicago, Inc., Plaintiff,**

**v.**

**Conseco Finance Servicing Corp. f/k/a Green Tree Financial Corp., and General Electric Capital Corporation Defendants.**

Bankruptcy Nos. 99 B 45910(REG), 99 B 11026, 99 B 11025. Adversary No. 00–2350.

United States Bankruptcy Court, S.D. New York.

May 15, 2001.

Pryor Cashman Sherman & Flynn LLP, By Carole Neville, Esq. and Holly S. Falkowitz, Esq., New York City, for Plaintiff Official Committee of Unsecured Creditors.

Togut Segal & Segal LLP, By Frank A. Oswald, Esq., New York City, for Debtor.

Latham & Watkins, Chicago, IL, By James A. Cherney, Esq., By Roland Young, Esq., New York City, for Defendant Conseco Finance Servicing Corporation, f/k/a Green Tree Financial Corporation.

Gibson Dunn & Crutcher LLP, By Mitchell A. Karlan, Esq. and Rebecca Sanhueza, Esq., New York City, for Defendant General Electric Capital Corp.

## DECISION ON MOTIONS TO DISMISS

ROBERT E. GERBER, Bankruptcy Judge.

### Introduction

In this adversary proceeding—a "lender liability" action—the Official Committee of Unsecured Creditors (the "Committee") in the chapter 11 cases of the debtor advertising agencies Lois/USA, Inc. ("Lois/USA"); Lois/USA New York, Inc. ("Lois/NY") and Lois/USA Chicago, Inc. ("Lois/Chicago," and collectively, "Lois") seeks recovery, on behalf of the Lois estate, of not less than $45 million from the debtors' former secured lenders, defendants Green Tree Financial Corp. ("Green Tree")[1] and General Electric Credit Corporation ("GECC," and together with Green Tree, the "Lenders"), and seeks equitable subordination of the Lenders' claims.

In June 1999, Lois closed on a secured credit facility provided by the Lenders, for a maximum extension of credit of $30 million (but which, as a practical matter, would result in a considerably lesser amount being disbursed, by reason of borrowing base restrictions), replacing a $25 million maximum facility that had been provided by Sanwa Business Credit Corporation ("Sanwa"). The Lenders' facility was documented, in part, by a 111–page Loan and Security Agreement, dated as of June 17, 1999 (the "Agreement"). The Committee alleges, among other things, that before the Agreement was signed, Green Tree made promises and representations to Lois with respect to the facility that ultimately became the subject of the Agreement, including representations as to the size of the facility that would be provided; the time by which the financing would be made available; and the amounts that could be drawn down under its borrowing base formulas. These promises, the Committee alleges, after having been relied on to its detriment by Lois, were not kept, and representations made by Green Tree with respect to the prospective financing were fraudulently (or, alternatively, negligently) made.

GECC, as alleged by the Committee, is bound by the acts of Green Tree, which, after the closing of the loan, was agent for the facility. Also, the Committee alleges that the Lenders declared a nonpayment default under the new facility within approximately three months of closing on it, raising alleged questions as to their intention ever to perform under it, good faith in performance, or both. The Committee also has argued in its briefs (though significant portions of this were not so alleged in the Complaint) that the Lenders engaged in a variety of post-closing acts with the

---

**1.** As alleged in the Complaint, Green Tree was acquired by Conseco, Inc. in 1998, and was thereafter renamed Conseco Finance Corp. (Cmplt. ¶ 8).

purpose or effect of exercising control over Lois' operations for their own benefit—including, perhaps most significantly, directing that unsecured creditors not be paid at the same time that the Lenders' own loans were being paid down.

Based on those and other matters, the Committee asserts nine causes of action, including damage claims sounding or arguably sounding in contract, equity, fraud and other torts, and breach of fiduciary duty, in addition to the request for equitable subordination. But relying in substantial part on an Illinois statute that they assert protects them from claims of this nature,[2] Illinois common law (which they contend is applicable to all claims other than the claim for equitable subordination), and New York law—which they contend supports dismissal even if Illinois law does not apply—the Lenders have moved to dismiss all nine causes of action for failure to state a claim upon which relief can be granted.[3] The Lenders also seek dismissal of the fraud claims for failure to state the circumstances constituting the alleged fraud with the requisite particularity.[4]

The matter was extensively briefed and argued.[5] The motions are granted in part and denied in part,[6] under the choice-of-

---

**2.** Illinois Credit Agreements Act, 815 ILCS 160 et seq. ("ICAA").

**3.** *See* Fed.R.Civ.P. 12(b)(6), as made applicable to adversary proceedings by Fed. R. Bankr.P. 7012.

**4.** *See* Fed.R.Civ.P. 9(b), as made applicable to adversary proceedings under Fed. R. Bankr.P. 7009.

**5.** After each of Green Tree and GECC filed an opening memorandum, the Committee filed an answering memorandum; each of Green Tree and GECC filed a reply; and the Committee filed a surreply. References to their filings are cited as —— Br. # 1 (or # 2) at ——e.g., "Green Tree Br. # 1 at 9."

**6.** Claims for Relief # 1 (promissory estoppel) (determined under Illinois law), # 2 (unjust enrichment) (determined under Illinois law), # 6 (negligent misrepresentation) (determined under New York law), and # 9 (breach of fiduciary duty) (determined under Illinois law) are dismissed, under Fed.R.Civ.P. 12(b)(6), as against both Green Tree and GECC.

The motions to dismiss Claim for Relief # 7 (bad faith) (determined under Illinois law) are granted insofar as the claims rest on acts prior to the execution of the Agreement, and denied insofar as they relate to acts after the execution of the Agreement. Illinois law shall govern any further proceedings with respect to this claim.

The motions to dismiss Claims for Relief # 4 (fraudulent misrepresentation) and # 5 (fraud) are denied with respect to Green Tree (under New York law), but granted with respect to GECC (under Fed. R. 9(b)); however, leave to replead such claims with respect to GECC, if such can be done consistent with Rules 9(b) and 11, is granted. The motions to dismiss Claim for Relief # 8 (breach of the implied covenant of good faith and fair dealing) are denied, under Illinois law, which shall govern any further proceedings with respect to this claim.

The motions to dismiss Claim for Relief # 3 (equitable subordination) (determined under federal law) are granted, except to the extent that this claim for relief relies on fraud on the part of the Lenders or breach of the implied covenant of good faith and fair dealing—with respect to which the motions are denied. If the Committee wishes to rely, with respect to equitable subordination, on allegations that it argued in opposition to the motions but did not plead—that the Lenders exercised control over the operations of Lois to the detriment of other creditors (e.g., by causing Lois not to pay unsecured creditors so that the Lenders themselves could be paid)—the Committee shall amend the Complaint to make such allegations, and such allegations shall then, of course, be subject to the usual standards requiring proof of them. Any such allegations shall not, however, be subject to another motion under Rule 12(b)(6).

As the matters before the Court are now governed by Fed.R.Civ.P. 12(b)(6), under which the allegations of the Complaint are taken as true, the Defendants may, if they are so advised, raise on later motions for summary judgment any matters taken as

law principles, and for the reasons, set forth more fully below.

### Major Issues

As pleaded in the Committee's Amended Complaint (hereafter, "Complaint" or, in citations, "Cmplt."), the allegedly wrongful conduct took place principally in New York (and by telephone between Atlanta, Georgia and New York), and the alleged injury took place in New York. However, it is undisputed for purposes of this motion that Green Tree had an office in Illinois (though the transaction was effected principally with Green Tree's Atlanta office); that GECC had an office in Chicago from which certain actions with respect to the loan were taken (though it had its principal office in Connecticut); that one of the debtors, Lois/Chicago, had an office in Chicago; that the loan was closed in Chicago; and that the Agreement provided, in relevant part (in addition to fixing Cook County, Illinois, as the exclusive forum for any disputes relating to the Agreement),[7] that

> This Agreement and the other Financing Agreements have been submitted to [Green Tree] at its office in Illinois, and this Agreement ... shall be construed in all respects in accordance with, and governed by, all of the provisions of the [Illinois Uniform Commercial] Code and by the other internal laws (as opposed to conflicts of law provisions) of the State of Illinois....

(Agreement ¶ 10.7). The Agreement did not provide, however, that any and all disputes *with respect to the parties' dealings* (or any analogous broader formula-

tion of the scope of the parties' choice-of-law agreement) would be governed by Illinois law.

With this as context, there are vigorously disputed issues of conflicts of law, particularly with respect to claims that do not require construction of (or are otherwise affected by) the parties' contract, along with the consideration of the underlying substantive law after the Court determines the state(s) whose law provides the rule of decision. Issues debated by the parties, in this connection, include, among others, whether:

(a) The Lenders can rely on the Agreement's choice-of-law provision to require application of the law of Illinois (and the Illinois Credit Agreements Act, in particular) when Illinois has a considerable nexus to the transaction, but when (with respect to the particular claim involved) it arguably lacks the predominant nexus to the locales of the allegedly wrongful conduct or of the alleged injury, and (at least as the Committee argues) would not be chosen as the state whose law is applied in the absence of a choice-of-law clause;

(b) Given the Agreement's choice-of-law provision providing that the "Agreement" and the "other Financing Agreements" would be "construed ... in accordance with" and "governed by" Illinois law—but not providing for a broader scope—Illinois law should nevertheless be deemed to be applicable to claims not covered by that language, by reason of a broader forum selection clause,[8] providing for an Illinois forum

---

true at this time (or which may be set forth in amendments to the Complaint) as to which they contend there is no evidentiary support and/or no material issue of fact.

7. *See* n.8 below.

8. The Agreement provided, in relevant part:

THE BORROWERS, THE AGENT AND EACH LENDER HEREBY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF COOK, STATE OF ILLINOIS, AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PRO-

for "any actions or proceedings *relating to* this Agreement or the other Financing Agreements" (emphasis added);

(c) Claims based on intentions not to honor promises with respect to financing to be provided in the future are actionable;

(d) The requisite duty exists upon which the Lenders can be held liable for alleged negligent misrepresentations with respect to the financing then under discussion;

(e) A fiduciary relationship between Lois and the Lenders can be found by reason of Lender conduct, notwithstanding a provision in the Agreement providing in substance that no fiduciary relationship should be found to exist; [9]

(f) Claims may be asserted for promissory estoppel for promises made with respect to a financing that was intended to be, and later was, evidenced by a written contract, and where an Illinois statute forecloses claims based on promises related to a credit agreement when such promises have not been reduced to writing; and

(g) Claims for "bad faith" or for violation of the implied covenant of good faith and fair dealing can lie in the absence of an underlying contract.

For the reasons described below, the Court concludes:

(a) The Agreement's choice-of-law clause providing for the application of the law of Illinois will not be disregarded, and will be respected concerning matters within its scope;

(b) The Agreement's choice-of-law provision will be applied only with respect to the matters within its scope, and thus will not be held to cover tort claims; the Court will not deem a more broadly drafted forum selection clause to be equivalent to, or to modify, a choice-of-law provision;

(c) Under the law of New York (determined to be applicable to the tort claims), claims of "promissory fraud"—allegations that Green Tree made a promise of further conduct knowing that it had no intention of performing, or with reckless disregard of whether or not it would—will be actionable, if and to the extent such can be proven;

(d) The requisite duty upon which the claim for negligent misrepresentation is based is lacking, and, for that reason,

---

CEEDINGS RELATING TO THIS AGREE-MENT OR THE OTHER FINANCING AGREEMENTS SHALL BE LITIGATED IN SUCH COURTS...

Agreement § 10.8 (block caps in original). The Lenders have not raised this provision as requiring dismissal or transfer of this adversary proceeding to Illinois.

9. Loan Agreement § 10.2, captioned "Several Obligations; Nature of Lender's Rights," provided, in relevant part:

> The respective obligations of the Lenders hereunder are several and not joint and no Lender shall be the partner or agent of any other Lender (except to the extent to which the Agent is authorized to act as such). *No provision contained herein or in any other Financing Agreement and no course of dealing between the parties shall be deemed to*

*create any fiduciary relationship between the Agent or any Lender and the Borrowers...* (Emphasis added). Though the Court is puzzled as to the reason, if any, for the duplication, another provision, Loan Agreement § 10.19—captioned with a substantially identical "Several Obligations; Nature of Lenders' Rights," with a difference in the caption, so far as the Court can tell, only in the placement of the apostrophe—provided, with a difference in a few words (but which, in this Court's view, still left the provisions substantively identical), the same thing again ("No provision contained herein or in any other Financing Agreement and no course of dealing between the parties shall be deemed to create any fiduciary relationship between the Agent or any Lender and any Borrower....").

among others, a claim for negligent misrepresentation cannot lie here;

(e) Under the law of Illinois (determined to be applicable to the fiduciary duty claim), no fiduciary relationship between either of the Lenders, on the one hand, or Lois, on the other, can be found here;

(f) Under the law of Illinois (determined to be applicable to claims under, or requiring construction of, the Agreement), promissory estoppel cannot be asserted to enforce promises made with respect to a promised financing, especially one that was intended to be, and later was, evidenced by a written contract (i.e., the Agreement); and

(g) Under the law of Illinois, claims for "bad faith" and for the violation of the implied covenant of good faith and fair dealing cannot be asserted with respect to the period before the execution of the Agreement.

### Facts

As alleged in the Complaint,[10] Lois operated a national full-service advertising and marketing communications company, with its corporate headquarters in New York, and with offices in Chicago and several other cities.[11] Its operations have now been consolidated in New York City, and its collective staff has been reduced to four employees.[12]

Historically, Lois financed its working capital requirements through credit facilities with third-party lenders, relying on third-party financing to level fluctuations in its borrowing needs. In October 1997, Lois entered into a credit facility with Sanwa, which permitted borrowings up to $25 million, based on a percentage of eligible accounts receivable.[13]

### Pre–Closing Events

In the late 1990's, in response to industry consolidation and slow revenues, Lois developed a plan for expansion through the acquisition of other advertising agencies. After several successful acquisitions, Lois continued its expansion strategy and sought to acquire 13 agencies over the course of eight months at a cost of $25.6 million (the "1998 Plan").[14]

In September 1998, Lois was conducting due diligence for the potential acquisition of one of those acquirees, but to consummate that acquisition and others, Lois would need additional funds. At this time, the balance under the Sanwa facility had fluctuated to a high of $20 million, and Lois sought an increase in the size of its facility to $40 million to fund the desired acquisitions. Sanwa informed Lois that Green Tree had expressed an interest in the 1998 Plan, and in committing an additional $15 million over and above the $25 million commitment made by Sanwa.[15]

While Sanwa initially expressed an interest in funding that $40 million line, Lois was told in December 1998 that Sanwa was going to be acquired by Fleet Capital

---

**10.** All facts set forth in this section are as so alleged, and are taken as true for the purpose of the motions (but, of course, for no other purpose). In this discussion, the greater detail appearing in the Committee's lengthy Complaint is frequently omitted.

**11.** Lois was founded in 1978 by George Lois, Lois' Co–Chairman and Co–Chief Executive Officer, said to be "the leading figure in the advertising field," widely recognized for his creative innovations and campaigns including

"I want my MTV," "Make Time for Time," the "Jiffy Lube" logo and Reebok's "Pump up and Air out." (Cmplt.¶ 14).

**12.** Cmplt. ¶¶ 11–12.

**13.** Cmplt. ¶¶ 15, 17, 20.

**14.** Cmplt. ¶¶ 16, 17.

**15.** Cmplt. ¶¶ 22, 23, 24, 25.

Corp. ("Fleet"), and Lois was told, about a month later, that Fleet was not interested in participating in the credit facility at all, because Lois' business structure did not fit into Fleet's portfolio. Fleet informed Lois that Lois had to obtain a replacement lender for its existing facility no later than June 1999.[16]

In response to Fleet's decision not to renew or extend the credit facility, Lois' management met with Green Tree in or about late January or early February 1999, to discuss the possibility that Green Tree would act as lead lending agent to take Fleet out and expand the credit facility. At this meeting, Lois stressed to Green Tree that timing was of the essence, because, among other things, without new and expanded financing, the status of acquisitions was unsure, as Lois was facing its seasonal downward variance in accounts receivable. Lois also told Green Tree that Lois' auditors would not issue a "going concern" audit opinion without replacement financing, and that Lois would have to delay filing its Form 10–K—its annual report with the SEC—unless such financing was put into place quickly.[17]

Green Tree "had no problem with Lois' acquisition strategy and volunteered to assist in putting together a $45 million syndicated credit facility."[18] In mid-February, 1999, Christopher Gouskos of Green Tree informed Lois that "Green Tree would put together a $45 million facility that would be structured under substantially similar terms as the existing credit facility between Sanwa and Lois."[19]

On or about February 23, 1999, Green Tree provided Lois with a proposal for a $45 million credit line, as set forth in a "Summary of Terms and Conditions." The terms included a closing fee of .375% of the credit line, "a base rate of Eurodollar margin of +3.5%,"[20] and a borrowing base of "85% of the eligible account receivables." Lois "accepted the Summary of Terms and Conditions,"[21] and provided a deposit of $50,000 and a letter affirming Lois' direction to the law firm of Winston and Strawn,[22] to commence the legal documentation relating to the loan and its obligations to satisfy the legal services bill.[23]

At about this time, Green Tree then made a number of alleged misrepresentations, and/or promises, without an expectation of performing on them.[24] In the first

---

16. Cmplt. ¶¶ 24, 29.

17. Cmplt. ¶¶ 30, 31.

18. Cmplt. ¶ 32.

19. *Id.* The quotes are of the Committee's allegation, which may or may not represent the exact words Gouskos is alleged to have used. The Committee further alleges, as arguably relevant for Fed.R.Civ.P. 9(b) purposes, for conflicts of law purposes, or both, that this information was conveyed either during a phone conversation between Gouskos in Atlanta and Lois' New York office, or on a visit to Lois' New York headquarters. *Id.*

20. The Court understood this to mean that the interest rate on borrowings would be 3.5% over the Eurodollar rate as it might fluctuate over time.

21. Cmplt. ¶ 35.

22. *Id.* Winston & Strawn, whose Chicago office was acting in the transaction, was apparently counsel for Green Tree. *See* Agreement § 10.12 (notices to Green Tree also to go to Winston & Strawn).

23. Cmplt. ¶ 35. The Committee does not amplify on the legal significance, if any, of its acceptance of the "Summary of Terms and Conditions." By reason of the continued allegations in ¶ 35, however, it is clear that Lois understood that more detailed and extensive documentation relating to the loan was going to be prepared.

24. This characterization does not appear at this point in the Complaint, but these allegations are later incorporated by reference into

of these, "Lois was led to believe" that the credit facility then being discussed with Green Tree "would be based on two components" [25]—the first to be an asset-based working capital line of credit, to be calculated at approximately 85% of eligible receivables, and the second to be utilized for the funding of the 1998 Plan. However (as alleged on information and belief), "Green Tree knew that it virtually was impossible for Green Tree to extend a $45 million credit line to Lois consisting of both of the above components." [26]

In what can be regarded as the second of the alleged misrepresentations, Green Tree determined not to expand the credit line beyond $30 million, but notwithstanding this determination, "Lois always was assured" by Gouskos, through the winter and early spring of 1999, "that the necessary credit facility of $45 million under substantially similar terms to the Sanwa facility would be arranged in order to implement the acquisition strategy and to ensure that adequate cash would be available to fund operations." [27]

Lois officers repeatedly told Gouskos that they had to have the loan closed prior to March 31, 1999, as it was needed to file the 10–K; because Lois wanted to close when its accounts receivable (which represented the borrowing base) were high; and because the additional capital was needed for the acquisitions. [28] "Gouskos assured Lois officers that the loan would close prior to March 31, 1999." [29] However, the due diligence period dragged out, since (as alleged on information and belief) neither of the Lenders had significant experience in providing credit facilities to a service-based business like Lois, or had previously entered into a financing agreement with an advertising agency. [30]

Throughout the due diligence period, the Lenders [31] "continued to assure Lois that the facility was a certainty, and that the terms would be substantially similar to Lois' previous facility with Sanwa." However, in mid-March 1999, Gouskos of Green Tree informed officers of Lois that the deal could be closed for $30 million, with Green Tree and GECC as participating lenders, and that Green Tree would continue to look for additional financing for the remaining $15 million after the closing. Lois was left with no choice but to agree to the reduction in the available financing, as securing alternate financing would have taken at least four or five months (at which point the Sanwa facility would have long been terminated, leaving Lois without any funding), and closing down Lois' operations while it secured additional funding was also not an option, because once this was done in the advertising business, Lois'

---

claims based on them, and can be fairly read as embodying elements of the claims upon which the Committee relies.

25. Cmplt. ¶ 36.

26. Cmplt. ¶ 37.

27. Cmplt. ¶¶ 38, 39. The Committee further alleges—again as arguably relevant for Fed. R.Civ.P. 9(b) purposes, for conflicts of law purposes, or both—that these conversations occurred during phone calls between Gouskos in Atlanta and Lois officers in New York, or when Gouskos was visiting Lois' New York headquarters. *Id.*

28. Cmplt. ¶ 40.

29. Cmplt. ¶ 41. Again, it is alleged that this was said either on the phone between Atlanta and New York, or on a visit to Lois' New York headquarters. *Id.*

30. *Id.*

31. In early March 1999, GECC expressed an interest in participating in the facility—to put in $15 million of it. (Cmplt.¶ 43).

clientele would be lost immediately.[32]

Throughout April and May, the closing of the credit facility continued to be delayed. At this point obtaining a replacement facility to fund day-to-day operations had become Lois' paramount concern. However, "Lois had been lured so far down the path with the Lenders that it could not find alternative financing."[33] At this point, Lois was entering the slow level of its business cycle, at which accounts receivable would reach their traditional low levels; was faced with the imminent termination of the Sanwa facility; and was under extreme pressure to file its 10–K with the SEC, which could not be completed until the financing was consummated.[34]

At that point, the Lenders "took advantage of Lois' situation to introduce more onerous terms to the proposed facility."[35] In late April or early May, Gouskos and/or Kevin Thompson, also of Green Tree, told Lois that the interest rate and fees for the loan were being increased, at the demand of GECC; that the loan committee's approval had expired; and that the Lenders would not provide another commitment without obtaining a lending reserve against availability. Again, given the impending expiration of the Sanwa facility, Lois had no other option but to accept these terms.[36]

On or about May 24, 1999—three weeks before the Sanwa facility would expire—Lois received an offer sheet with substantially altered terms. The new terms greatly reduced Lois' borrowing ability, and made the facility less attractive in other respects as well. The altered terms included (1) a commitment by the Lenders to provide only a $30 million facility (in contrast to the $45 million facility that was allegedly promised); (2) a more limited definition of eligible accounts receivable, which would be based on a closing audit to be completed by GECC; (3) an increase in the origination fee, from $375,000 to $600,000; (4) an increase in the interest rate, from LIBOR + 2.5% to LIBOR + 4%; (5) additional standards for acquisitions Lois might make, identified as "Acquisition Draw Limits"; and (6) a $3 million reserve to be maintained against availability.[37]

In light of the intense time pressure on Lois, and the need for immediate replacement funding, Lois "had no recourse but to agree to the changing terms set by the Lenders."[38]

*Post–Closing Events*

The closing took place on June 17, 1999, at the offices of Winston & Strawn.[39] The indebtedness on the Sanwa facility was repaid with the closing proceeds, but as a result of the reduction in the size of the facility and the "minimal actual availability" under it, Lois lost its planned acquisitions; the "1998 Plan was destroyed"; and Lois began a downward spiral that ultimately forced it into a severe liquidity crisis where it could not meet its daily

32. Cmplt. ¶ 46.

33. Cmplt. ¶ 48. By this time, one acquisition opportunity had been lost, and Lois was facing the loss of the other potential acquisitions. *Id.*

34. Cmplt. ¶ 49.

35. Cmplt. ¶ 50.

36. Cmplt. ¶ 51.

37. Cmplt. ¶¶ 52–54.

38. Cmplt. ¶ 56.

39. Cmplt. ¶ 57. Though not alleged as such, it is undisputed that the closing took place at Winston & Strawn's offices in Chicago, Illinois.

operating expenses.[40]

The diminished borrowing base implemented by the Lenders reduced Lois' availability to approximately $22.5 million. Deducting the $3 million reserve, a $1 million letter of credit (a requirement under the facility), the payoff to Sanwa of $15.6 million, and the origination fee of $600,000, Lois was left with immediately available funds of only $2.3 million. This amount "was significantly less than anticipated," and in no way sufficient to continue the 1998 Plan, "let alone meet the daily cash requirements of Lois." [41]

In response to the limited availability and anticipating liquidity problems, Lois made a number of requests of the Lenders to discuss a release of the reserve. However, Lois was advised no changes would be made, except for a change in interest accrual from quarterly to daily, with the result of making the cash availability even more restrictive. In September 1999, at a meeting at Lois' offices attended by representatives of the Lenders, the Lenders "appeared indifferent to Lois' requests for assistance"; Green Tree's Gouskos "rebuked" Lois' suggestion that the Lenders work with them so that all involved parties, including the trade creditors, would suffer as little damage as possible; and Gouskos stated "that the Lenders were fully secured and they had every intention of collecting the full amount of their lien." [42]

In September of 1999, three months after the Agreement was executed, Green Tree declared a "technical" [43] default un-

der the facility, resulting from Lois' inability to timely pay its creditors, which had the immediate effect of raising the interest rate by an additional 2%, and making future lending under the facility conditional. Green Tree then ceased normal funding activity, and funded Lois on a day-to-day basis. Green Tree also sought to collect the accounts receivable directly, by sending out demand letters on October 4, 1999, "which actually resulted in a decrease in cash payments." [44]

By October 1, 1999 (at which time $8 million in obligations was outstanding to the Lenders), Lois' bankruptcy was inevitable. In light of the financial crisis, Lois management determined that the most appropriate steps would be to halt all payments except for those with respect to one of its subsidiaries, Fogarty & Klein, for the purpose of saving the value of that enterprise. Green Tree, GECC and Lois met in New York to discuss a plan to sell Fogarty & Klein, at which time Lois also informed the Lenders that Lois intended to declare bankruptcy in the imminent future. However, "the Lenders' indifference towards Lois' financial condition was apparent at this meeting." Gouskos "reiterated the fact that the Lenders were fully secured and that they didn't care about Lois' intentions." [45]

On October 15, 1999, Lois ceased operations. Lois/USA filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code on October 20, 1999, followed by the voluntary petitions of its subsidiaries Lois/Chicago and Lois/New York on October 26, 1999.

40. Cmplt. ¶ 55.

41. Cmplt. ¶ 64.

42. Cmplt. ¶¶ 65–68.

43. This is the word used by the Committee; the Court understood it to refer to a nonpayment default. The Court considers it unnec-

essary to decide, for purposes of the motions, whether it should be regarded as any more or any less of a default than any other.

44. Cmplt. ¶ 69.

45. Cmplt. ¶ 70.

*Claims Based on the Foregoing*

In the context of the facts stated above, the Committee asserts nine claims for relief. Stripped to their essence, they are as follows:

1. Promissory Estoppel *(Claim for Relief # 1)*

In its claim based on promissory estoppel, the Committee alleges in essence that Green Tree, acting on its own behalf and as agent for GECC, its alleged principal,[46] (1) promised to provide a credit facility of $45 million; (2) under substantially similar terms as the Sanwa facility. The Committee further alleges that Lois relied on the promises, by not seeking alternate financing, and that Lois' reliance was both reasonable and foreseeable.[47]

The Committee further alleges that as a result of Lois' reliance on Green Tree's representations (which the Court, under *Conley* principles,[48] will deem to be equivalent to the alleged promises), Lois: (1) was precluded from obtaining the financing with a timing and on such reasonable terms as had been promised originally which would have allowed Lois to operate; (2) lost the cash flow from the planned acquisitions of thriving agencies; (3) lost the ability to obtain short-term financing that, even without the acquisitions, could have allowed Lois to survive and develop an alternative business plan; (4) was forced to agree to more onerous terms than originally agreed upon, including a higher fee structure, higher interest rate and lesser credit line, as listed above; and (5) was unable to file its Form 12B–25 with the SEC in a timely fashion, and was accordingly damaged.[49]

2. Unjust Enrichment *(Claim for Relief # 2)*

In its claim for unjust enrichment, the Committee repeats some, and realleges all, of its earlier allegations, and notes that Green Tree (once more on its own behalf and as agent of GECC) received high returns on its investment in the credit facility, as it collected approximately $860,000 in fees from Lois, with little risk. The Committee alleges that the Lenders' retention of the benefits they obtained from their unjust actions violates fundamental principals of equity and good conscience.[50]

3. Equitable Subordination *(Claim for Relief # 3)*

In its equitable subordination claim, the Committee alleges that the Lenders breached an alleged fiduciary duty to Lois "by engaging in a pattern of misrepresentations and purposeful delays in closing the credit facility," and by "using their leverage to obtain increased fees and interest amounts from Lois"—as a result of which Lois incurred additional unsecured credit which it could not pay. Equitable subordination, the Committee alleges, would be consistent with the Bankruptcy Code, and as a matter of equity, the Lenders' claims

---

**46.** Cmplt. ¶ 74. In this connection, GECC notes, without dispute from the Committee, that Green Tree became the agent for the facility upon its closing in June, and was not GECC's agent at the time the alleged promises were made. This is relevant to GECC's Rule 9(b) motion, discussed at page 105 below.

**47.** Cmplt. ¶¶ 73, 75, 76.

**48.** *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), laying out standards applicable to the determination of motions under Fed.R.Civ.P. 12(b)(6), discussed at page 89 below.

**49.** Cmplt. ¶¶ 78–79.

**50.** Cmplt. ¶¶ 82, 88. Though the thrust of this Claim for Relief is that, in justice, the fees and/or other unjust enrichment should be refunded, the damages sought are $45 million, and not the $860,000 or a similar lesser amount. (*See* "Wherefore" clause, following Cmplt. ¶ 88).

should be subordinated to the claims of the unsecured creditors.[51]

### 4. Fraudulent Misrepresentation *(Claim for Relief # 4)*

The Committee alleges that Green Tree, once more acting on its own behalf and as agent of GECC, its principal, made representations and led Lois to believe it would provide (1) a credit facility of $45 million; (2) under substantially similar terms as the Sanwa facility. Along with allegations, among other things, of reliance and damage, the Committee alleges (1) Green Tree made these representations with reckless disregard as to their truth or falsity, or knew that the representations were false, as it had no intention of entering into a facility of that size or under terms similar to the terms of the Sanwa facility; and (2) Green Tree knew that the approval of the loan under substantially similar terms as the Sanwa facility could not be made.[52]

### 5. Fraud *(Claim for Relief # 5)*

Insofar as the Court can discern, this claim is identical to its predecessor, except that it is based solely on an allegation of knowledge of the falsity of the promissory representations, and lacks the allegation of recklessness.

### 6. Negligent Misrepresentation *(Claim for Relief # 6)*

The Committee then alleges that in the event that Green Tree did not know at the time of its representations to Lois that a $45 million credit facility could not be approved, Green Tree "should have known" that Lois' financial condition, and the Lenders' procedures with respect to loan approvals and fees, would preclude a $45 million facility with terms similar to the Sanwa facility. The Committee further alleges that Green Tree had a duty to make itself aware of "both correct bank procedures and of any financial problems Lois was having" prior to representing that the credit facility would be for $45 million under substantially similar terms as the Sanwa facility, and that in making its representations, "Green Tree personnel failed to exercise the degree of care or expertise of reasonably competent bank officers, which Lois was entitled to expect." [53] The Committee further alleges that Green Tree had a duty to communicate accurate information when making representations to Lois concerning the terms of the credit facility, as Lois was relying on Green Tree's representations concerning the facility in determining whether to proceed with the loan.[54]

The Committee further alleges that once the credit facility was in effect, the Lenders asserted control over Lois' finances (as they often advised Lois to defer payments on its accounts payable so as to make them

---

**51.** Cmplt. ¶¶ 90–93. The basis for an alternative type of relief that is sought (disallowance of the Lenders' claims, *id.* ¶ 94) is not articulated, or, indeed, otherwise referred to in the Complaint. As discussed below, see n.158, equitable subordination is not appropriate to obtain such relief.

These allegations seem to refer, in their entirety, to conduct *before* the execution of the Agreement. Earlier in the Complaint (all of whose preceding 88 paragraphs of allegations were incorporated by reference, without specific reliance on any of them), there were allegations of alleged heavy-handed activities on the part of the Lenders in connection with their management of the facility *after* the Agreement was executed, and the Committee argued in its briefs on the motions (though little of this, so far as the Court can determine, was pleaded in the Complaint) that the Lenders used their power to cause Lois not to pay unsecured creditors and to pay the Lenders instead.

**52.** Cmplt. ¶¶ 96, 98, 99.

**53.** Cmplt. ¶¶ 126–128.

**54.** Cmplt. ¶¶ 126–129.

only when absolutely necessary), and that this exercise of "such improper control" created "an additional fiduciary relationship" [55] between the Lenders and Lois, thus obligating them to act in accordance with Lois' best interests. As alleged in the Complaint, Green Tree breached those "aforementioned duties" when it made its representations to Lois.[56]

7. Bad Faith *(Claim for Relief # 7)*

The Committee alleges both pre- and post-Agreement acts in its next claim, for "bad faith." In the former category, relating to pre-Agreement acts, are allegations that the Lenders (presumably including GECC) wrongfully secured a superior bargaining position through inducement and delay so that they were able to dictate the terms of the credit facility; that it was essential for Lois to have a replacement facility; that "Lois had no choice but to rely upon and place its confidence on the relationship with the [Lenders]"; that it "had every reason to rely on Green Tree's representations"; and that it was forced to accept the terms of the new credit facility.[57]

In the latter category, relating to post-Agreement acts, are allegations that Lois' attempts to seek relief from the Lenders to remediate its financial crisis caused by the limited availability under the facility were futile, where the Lenders subsequently imposed greater restrictions and ultimately declared a technical default and ceased normal funding. By rejecting Lois'

attempted resolutions, the Committee alleges that the Lenders acted indifferently, arbitrarily and capriciously in rejecting Lois' efforts "to work out an amicable resolution to the situation." [58]

8. Breach of the Implied Covenant of Good Faith and Fair Dealing *(Claim for Relief # 8)*

In this claim, the Committee alleges—all with respect to the time after the Agreement was executed—that the Lenders were aware of Lois' urgent need for working capital to operate its business, the status of its accounts receivable, and the nature of its operations. The Committee then alleges that notwithstanding this knowledge and their commitment under the Agreement, the Lenders unjustifiably and without warning increased the borrowing restrictions, declared a "technical" default, and eventually ceased normal funding, leaving Lois with no opportunity to seek and secure alternative financing. In doing so, the Committee alleges, the Lenders "acted indifferently, arbitrarily and capriciously and in a manner inconsistent with Lois' expectations of its business relationship with the [Lenders]." [59]

9. Breach of Fiduciary Duty *(Claim for Relief # 9)*

This claim tracks, in very nearly the same words, Claim # 6, for negligent misrepresentation, and insofar as the Court can ascertain, the facts pleaded to support this claim are no different substantively.

---

55. It is not clear to the Court from the Complaint to what other fiduciary relationship(s) this "additional fiduciary relationship" was in addition.

56. Cmplt. ¶¶ 126–133.

57. Cmplt. ¶¶ 146–149.

58. Cmplt. ¶¶ 150–152. The Committee continues that the Lenders' course of dealings with Lois from the inception of their relation-

ship with Lois—in other words, during both the pre- and post-Agreement phases, demonstrates that the Lenders "acted in bad faith." *Id.* ¶ 153.

59. Cmplt. ¶¶ 157–161. The damages claimed for this are the $45 million that allegedly would have been the gross amount of the facility if the facility had been provided as the Committee elsewhere alleged had been promised.

Like the negligent misrepresentation claim, this claim speaks of the exercise of allegedly improper control after the execution of the Agreement having created "an additional fiduciary relationship," [60] but the Complaint is silent as to the existence of, or basis for finding, any earlier or other fiduciary relationship(s), particularly during the period before the execution of the Agreement, when the promises that are the heart of the Committee's Complaint were allegedly made.

## I.

### Standards for Dismissal

As the Committee notes, the Lenders have to meet a very high standard for dismissal. Under well-settled principles, when considering a motion to dismiss under Rule 12(b)(6), the factual allegations in the complaint are presumed true, and are construed in favor of the pleader. *See, e.g., Luedke v. Delta Air Lines, Inc.,* 159 B.R. 385, 389 (S.D.N.Y.1993) (Patterson, J.) (applying this standard, denying motion to dismiss third-party complaint). It has long been the law that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. at 102; *accord Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 44 (2d Cir.1997) (quoting *Conley*); *In re Granite Partners, L.P.,* 210 B.R. 508, 514 (Bankr.S.D.N.Y.1997) (Bernstein, C.J.) (denying motion to dismiss complaint, noting dismissal would be proper only when the plaintiff would not be entitled to any type of relief, even if it prevailed on the merits of its factual allegations). As the

Supreme Court held in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974):

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*Id.* at 236, 94 S.Ct. at 1686.

■ Nevertheless, dismissal can and should be granted if the plaintiff's allegations, taken as true, along with any inferences that flow from them, are insufficient as a matter of law. *See, e.g., Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994) (applying the standard discussed above but nevertheless dismissing, where claims for relief were legally insufficient); *In re 80 Nassau Assocs.,* 169 B.R. 832, 841 (Bankr.S.D.N.Y.1994) (Bernstein, C.J.) (applying this standard and granting motion to dismiss, with leave to amend, where allegations did not support claim of equitable subordination).

■ In addition to the complaint itself, a court may consider, on a motion to dismiss, the contents of any documents attached to the complaint or incorporated by reference; matters as to which it can take judicial notice; and documents in the possession of the non-moving party (i.e., the Committee here), or which the non-moving party knew of or relied on in connection with its complaint. *See Granite*

---

60. Cmplt. ¶ 169. The Committee does not mention, and thus plead a basis for circumventing, §§ 10.2 and 10.19 of the Agreement, *see* n.9 above, providing in substance that any course of dealings between the parties should not be deemed to create any fiduciary relationship between any of the Lenders and Lois.

*Partners,* 210 B.R. at 514. And where a plaintiff alleges a claim based on a written instrument, a court may consider such an instrument even if it was not attached to the complaint and incorporated under Rule 10(c). *See Barnum v. Millbrook,* 850 F.Supp. 1227, 1232 (S.D.N.Y.1994), *aff'd without opinion,* 43 F.3d 1458 (2d Cir. 1994) (considering entire purchase and sale agreement that was partially incorporated in the complaint). Finally, if the allegations of a complaint are contradicted by other documents, the court need not accept as true the allegations in the complaint. *Id.* at 1232–1233.[61]

## II.

### Choice-of-law Issues

In particular by reason of the potential effect of the Illinois Commercial Credit Act (a statute as to which New York ap-

parently has no counterpart), and actual or arguable differences in the law of fraud when applied to promises and/or events which may take place in the future—the conflicts of law issues are among the most important in this case. For like reasons, they are the most vigorously disputed.

At the outset, however, the parties do not disagree. They agree or accept for the purposes of this motion[62] that when this Court analyzes the conflicts of law with respect to claims arising under state law, it starts with the choice-of-law rules of New York, the forum state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) (federal courts must apply forum state's conflicts of law rules in diversity cases).[63] In applying New York's choice-of-law rules, however, the parties

**61.** The Committee has expressed a preference that to the extent relevant, any documents considered on this motion be considered as incorporated within the Complaint, rather than by converting this motion into one for summary judgment. (Committee Br. # 1 at 12 n.4). The Court has done so.

**62.** *See* Committee Br. # 1 at 13; GECC Br. # 2 at 4 n.2 ("We agree with plaintiff that New York's choice of law rules apply here."); Green Tree Br. # 2 at 3 n.2 (stating that while the caselaw cited by the Committee "leaves this question open," conceding "for the purposes of this motion" that New York's choice-of-law rules apply).

**63.** The Court's subject matter jurisdiction in this adversary proceeding is predicated on 28 U.S.C. § 1334 (conferring jurisdiction on the district courts—and hence this Court—for matters arising under title 11, arising in cases under title 11, and for matters related to cases under title 11), rather than 28 U.S.C. § 1332 (conferring jurisdiction in diversity cases), but many federal bankruptcy courts have read *Klaxon* as imposing the forum state's choice-of-law rules on bankruptcy adjudications where the underlying rights and obligations are defined by state law. *In re Koreag Con-*

*trole et Revision S.A.,* 961 F.2d 341, 350 (2d Cir.1992), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992) (citing cases). There is post-*Koreag* authority to the contrary outside of the Second Circuit, but to the extent this was not settled at the time the parties briefed and argued the motions, it no longer is subject to doubt in this Circuit after the Second Circuit's recent decision in *Bianco v. Erkins (In re Gaston & Snow),* 243 F.3d 599, 605–607 (2d Cir.2001) (where case does not implicate important federal bankruptcy policy, bankruptcy court considering state law claims should apply choice-of-law principles of forum state, rather than federal choice-of-law rules; noting, but not following, the contrary authority; citing *Koreag,* though noting language in *Koreag* to that effect was dictum).

On the other hand, "federal principles should guide our consideration of which jurisdiction's law applies in cases arising out of federal law," and this is "especially appropriate when a case implicates important federal bankruptcy policy," *Koreag,* 961 F.2d at 350, as Claim # 3, the request for equitable subordination, plainly does. For this reason or others, the Committee and the Lenders appear to agree that the claim for equitable subordination is governed by federal law. This Court agrees.

disagree vigorously, differing with respect to (a) whether this Court should honor the choice-of-law provision in the Agreement; (b) the coverage of that provision (i.e., the claims to which it applies), if and to the extent that the contractual choice-of-law provision is given deference; and (c) the law to be applied if and to the extent that the Court is not bound by the contractual choice of law.

## A. Deference to Contractual Choice-of-law Provision

As noted above, the Agreement provided that it "shall be construed in all respects in accordance with, and governed by" the law of Illinois.[64] An important threshold issue then, is whether this provision properly can be disregarded.

■ At least one of the Lenders seemed at one point to argue that the parties' invocation of Illinois law in the contract was determinative,[65] and the Committee argued that a predominance of contacts with a state other than Illinois would warrant disregarding the Illinois choice of law.[66] Each contention was overly broad. New York has choice-of-law rules applicable to instances in which the parties were silent as to the law that governs their dealings with each other—upon which the Committee, for understandable reasons, would like to rely. But where, as here,

parties have agreed on a choice-of-law rule applicable in whole or in part to their dealings, the analysis is not the same as it would be if they were silent on the subject. As the New York Court of Appeals has held, "[a]s a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored." *Freedman v. Chemical Construction Corp.*, 43 N.Y.2d 260, 265 n. *, 401 N.Y.S.2d 176, 372 N.E.2d 12, 15 n. * (1977); *accord Turtur v. Rothschild Registry Int'l*, 26 F.3d 304, 310 (2d Cir.1994) (describing the New York law, and quoting *Freedman*). It is as though the law of the selected jurisdiction were incorporated into the agreement by reference. *Freedman*, 43 N.Y.2d at 265, n. *, 401 N.Y.S.2d 176, 372 N.E.2d 12 (citing *Restatement, Conflicts of Law 2d* § 187, Comment c). Likewise, as the Second Circuit has held (construing New York law), "[i]n the absence of a violation of a fundamental state policy, New York courts generally defer to the choice of law made by the parties to a contract." *Cargill v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991).

The Second Circuit has also noted, however, that New York law allows a court to disregard the parties' choice when the "most significant contacts" with the matter in dispute are in another state. *Id.*[67] *See*

---

64. Agreement § 10.7.

65. *See* GECC Br. # 1 at 10 n.5 ("Illinois law governs this action. First, the borrowers agreed to be bound by Illinois law in the choice of law clause in the Agreement."); *cf.* Green Tree Br. # 1 at 3 n.2 (noting, as a predicate for the dismissal of all of the Committee's claims, that the Agreement provides that it "is governed by, and is to be construed in accordance with, Illinois law").

66. *See* Committee Br. # 1 at 15 ("Under New York law a court may 'disregard the parties' choice when the 'most significant contacts'

with the matter in dispute are in another state.'").

67. *Cargill* noted another factor relevant to whether a contractual choice-of-law clause should be disregarded—noting that "even when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law." *Id.* In *Cargill*, a diversity contract case, the parties had agreed that Massachusetts law would govern all actions brought to enforce their agreement. *Id.* at 55. However, "nearly all the significant contacts" with the dispute were in New York, and—significantly, in this Court's view—both

*also Haag v. Barnes,* 9 N.Y.2d 554, 559, 175 N.E.2d 441, 443, 216 N.Y.S.2d 65, 68 (1961) (stating "traditional view" was that law governing a contract is to be determined by the intention of the parties, but noting that "[t]he more modern view" is that courts, instead of regarding as conclusive the parties' intention (or the place of making or performance) would look to the law of the place with the most significant contacts with the matter of dispute—and then holding that "[w]hichever of these views one applies in this case," Illinois law, the law contractually chosen, would apply).

■ Thus it has been said that "[w]hile it is true that some jurisdictions give determinative effect to a choice-of-law clause," "New York is not one of them." *S. Leo Harmonay, Inc. v. Binks Mfg. Co.,* 597 F.Supp. 1014, 1024 (S.D.N.Y.1984) (Cooper, J.) (*"Harmonay"*), *aff'd without opinion,* 762 F.2d 990 (2d Cir.1985). But that does not mean that a contractual choice of law can or should readily be disregarded. The better rule, as the *Harmonay* court noted, is that suggested by Judge Learned Hand in *Krenger v. Pennsylvania R. Co.,* 174 F.2d 556, 560–561 (2d Cir.1949) (L.Hand, concurring), *cert. denied,* 338 U.S. 866, 70 S.Ct. 140, 94 L.Ed. 531 (1949):

[S]uch clauses are prima facie valid and will be upheld absent a showing that they result from fraud or overreaching, that they are unreasonable or unfair, or that enforcement would contravene a strong public policy of the forum.

597 F.Supp. at 1024–1025.

■ As the Committee notes,[68] in making the determination whether to disregard a contractual choice-of-law provision, New York courts have followed the "substantial relationship" approach. That approach, which the *Harmonay* court noted "parallels Judge Hand's rule," *id.* at 1025, was "stated succinctly," *id.,* in *Restatement (Second) of Conflicts of Law* (*"Restatement"*) § 187. It provides, in relevant part:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

---

sides, "without exception," *id.,* had based their briefs and arguments in both the district court and the Second Circuit on New York law. From this, the Second Circuit concluded that both sides "expect this case to be decided in accordance with New York law," *id.,* and it determined to "acquiesce in the parties' expectation," *id.,* and apply New York law.

*Cargill* does indeed support the proposition, as the Committee urges, that the contractual choice-of-law provision need not

be automatically honored, but this Court finds *Cargill* inconclusive on the subject of the circumstances under which the choice-of-law provision should be disregarded when one side wants it enforced. Obviously, because of the agreement of the parties in *Cargill,* as evidenced in the quoted language, the Second Circuit there had no occasion to address it.

**68.** *See* Committee Br. # 1 at 16 (citing *Harmonay,* 597 F.Supp. at 1025, citing, in turn, *Restatement* ).

*Id.*[69]

■ The Second Circuit has likewise applied this standard. As it noted in *Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987), also construing New York law:

> When such a provision exists and the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance, New York law requires the court to honor the parties' choice insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated.

*Id.* at 551 (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381, 165 N.Y.S.2d 475, 486, 144 N.E.2d 371, 379 (1957); *Restatement* § 187). *See also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir.1996) (stating, without articulated exceptions or qualifications, that "New York law gives full effect to parties' choice-of-law provisions," citing *Woodling*).

■ While the Committee notes a number of objective indicia which it argues are relevant "when applying the substantial relationship test"—"to determine the state with the most significant contacts to the subject matter of the contract and thus the appropriate law of the case"[70]—the Committee has addressed the *Restatement* § 187 criteria noted above to a notably lesser degree, and the Court believes that two separate standards, and concepts, may have been merged here. The indicia discussed by the Committee[71] track very nearly verbatim those listed in *Restatement* § 188 to determine the state with the most significant contacts "[i]n the absence of an effective choice of law by the parties."[72] While the Court agrees with the Committee that it is appropriate to consider the same indicia (though arguably along with others as well) when determining whether the state whose law has been invoked bears the requisite "substantial relationship" required under *Restatement*

**69.** Restatement § 186 covers the choice of law with respect to contracts generally; it provides that:

> Issues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188.

Restatement § 188 covers the choice of law that governs *in the absence of an effective choice* by the parties, a matter that obviously is moot if the Court determines that the parties' choice of law should be honored. It provides:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

**70.** Committee Br. # 1 at 16.

**71.** Place of contracting; place of negotiation; place of performance; location of the subject matter of the contract; and domicile of the contracting parties; *see* Committee Br. # 1 at 16.

**72.** *See* n.69 above.

**94**

§ 187, the inquiry does not (as the Committee argues [73]) require that the state whose law has been invoked be the state with "the *most* significant contacts." [74]

Rather, the Court must determine whether there is a reasonable nexus between the state whose law has been invoked (here, Illinois) and the parties to the contract and their transaction—whether or not the relevant contacts with that state (here, Illinois) predominate over the contacts with other states (e.g., New York, or even Georgia) whose law might alternatively have been chosen. [75]

■ In our case, (1) one of the borrowers (Lois/Chicago) was in Illinois; [76] (2) GECC was, at least in some continuing way, in Illinois, and had an office in Chicago from which certain actions with respect to the loan were taken; [77] (3) Green Tree, according to the Agreement, had an office, of some kind, in Illinois; [78] (4) counsel for the Lenders (or at least Green Tree), Winston & Strawn, was in Illinois; [79] and (5)

**73.** *See* Committee Br. # 1 at 16.

**74.** *Id.* (emphasis added).

**75.** The Committee is quite correct in noting that the court in *Harmonay* (Judge Irving Ben Cooper of the District Court) disregarded a contractual choice-of-law clause providing for application of the law of Illinois (the place of the defendant's business), relying instead on the law of New York, which he found to be the jurisdiction with the "most significant contacts." *See* 597 F.Supp. at 1025. However, Green Tree is right in its observation (Green Tree Br. # 2 at 4 n.4) that *Harmonay* (a construction contract dispute between subcontractor and general contractor, with both providing services under a prime contract for expansion of a GM plant) must be read in its context of dealing with two separate (and arguably dueling) choice-of-law provisions, one in the prime contract between GM and the general contractor, and another in the subcontract, which might make resort to extraneous factors appropriate—although it is also true that any conflict between the choice-of-law clauses does not appear to have been a major factor in the *Harmonay* court's decision to ignore both choice-of-law clauses and look to New York law on the basis of relative contacts. In any event, where, as here, there is a single choice-of-law provision whose enforcement is the matter in dispute, *Woodling* (aside from the not insignificant fact that it is a decision of the Second Circuit), is in this Court's view a more faithful application of the letter and spirit of the *Restatement* (and the bulk of New York law), and more closely applicable to the facts here. Accordingly, this Court chooses not to follow *Harmonay*, a decision of the District Court, and instead follows the Second Circuit's decision in *Woodling*.

**76.** Cmplt. ¶ 11.

**77.** *Id.* ¶ 48 ("Lois officers continually called James MacDonald III of GE in Chicago...."); Committee Br. # 1 at 5 (GECC had "an office in Chicago from which certain actions with respect to the loan were taken"). In GECC's brief, it goes further, saying GECC's "involvement in the loan transaction was from its Chicago office." (GECC Br. # 2 at 9). As this is not supported by either allegations of the Complaint or the Committee's admissions, the Court considers it inappropriate to rely on this broader statement. In the narrower way by which the Committee described GECC's Illinois presence, the Court considers this as an appropriate contact to consider, even though GECC's principal office is in Connecticut. (Cmplt. ¶ 9).

**78.** Section 10.7 of the Agreement says "This Agreement and the other Financing Agreements have been submitted to the Agent and [Green Tree] at its office in Illinois." Whether this is just jargon or has substance is not clear on this record; the Court is not in a position to conclude anything other than the fact that Green Tree had some kind of an office in Illinois, and, as also noted, that the closing took place in Illinois. Green Tree's principal office is alleged to be in St. Paul, Minnesota (*id.* ¶ 8), and the Green Tree Office identified for the delivery of notices under the Agreement was in Alpharetta, Georgia. (Agreement § 10.12).

**79.** Agreement § 10.7.

the place of contracting, i.e., the closing, was in Illinois.[80] (Other factors argued by the Lenders to represent additional contacts are rejected by this Court as unpersuasive, or at least not established on this record.).[81]

These are fairly substantial, but hardly overwhelming, contacts, and this Court believes that if it were to weigh the relative contacts, it would not necessarily find that the Illinois contacts outweigh (especially, materially) the contacts with New York.[82] But that is not the test. Facts # 1, # 2, # 3 and # 5 (at least when in combination with each other) require the Court to find that the requisite basis for the parties' invocation of the law of Illinois exists. The Court cannot say that there here is lacking

a substantial relationship to the State of Illinois, nor that there is lacking a reasonable basis for Lois and the Lenders to have agreed on the applicability of the law of Illinois.[83]

This Court's conclusion in that regard is bolstered, it believes, by Comments *e* and *f* to *Restatement* § 187. Comment *e* provides, in relevant part:

> *Rationale.* Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract

80. Complaint ¶ 57 ("at a closing at the offices of Winston & Strawn").

81. The Court is not in a position to agree with GECC's point, at least on this record, that "[t]he principal place of performance (the disbursing of the loan proceeds) was in Illinois." (GECC Br. # 2 at 6). The authority argued by GECC to support that contention, Agreement § 2.6(a), while unambiguous in providing what the parties bargained for, is ambiguous in articulating any objectively discernible place of performance; it provides that "[n]ot later than 12:00 noon (Chicago time) on each Funding Date, each Lender shall make available its Pro Rata Share of the advances under the Revolving Loan ... in funds immediately available in Chicago, Illinois to the Agent at its address specified pursuant to subsection 10.12." In these days of wire transfers, funds advanced in Connecticut or Georgia could be "available in" Illinois, New York, or a host of other places.

> An additional factor urged by Green Tree, that "negotiations occurred in Illinois" (Green Tree Br. # 2 at 2), is in this Court's view insufficiently established on this record and inappropriate for consideration on a 12(b)(6) motion, and has been disregarded. Likewise, the Court is reluctant to find as relevant to the required nexus to Illinois that the parties chose also to agree to an Illinois forum in the event of a dispute, or referred, in their agreement, to "Chicago

time." The Court regards these simply as additional agreements between the parties, in substance no different than their agreement as to choice of law. To rely on related agreements, rather than surrounding facts, would be circular and a kind of bootstrapping; it also would be subject to the kind of abuse discussed in n.83 below.

82. The Court certainly does not agree, as Green Tree argues, that "Illinois was the logical choice" (Green Tree Br. # 2 at 2), but it does agree "that is exactly what all of the parties to the Agreement ultimately agreed to be bound by." *Id.*

83. The Court believes it important to note also what it did not decide. It has not held that the requisite substantial connection could be satisfied solely by the fact that the state whose law was chosen was the state of the lenders' lawyer, or even solely by arranging for the closing of a transaction in the chosen state. When the law of a state is particularly attractive for a party that may have the bargaining power to get what it wants, it may wish to use its bargaining power to invoke the law of the state it favors even when other contacts are lacking. In certain circumstances, this could have the potential for abuse—choosing the law of a favored state as a kind of flag of convenience. But any limits in this regard can be determined if and when a case presenting those issues arises.

and the rights created thereby. In this way, certainty and predictability of result are most likely to be secured.

(Italics in original).[84] Predictability in result, and honoring the justified expectations of the parties, is important in connection with any contract, and is at least as important where lenders are putting substantial sums of their funds at risk, and the implementation of borrowers' business plans may turn on lenders honoring their commitments to lend.

Of course there still are limits to the parties' power so to agree. One, not argued to be relevant here, is that the law of the chosen state is contrary to the public policy of the forum state. Another is the requirement that there be a reasonable basis for the parties' invocation of the law they chose to adopt. Comment *f* deals with the latter concern. It provides, in relevant part:

> *Requirement of reasonable basis for parties' choice.* The forum will not apply the chosen law ... if the parties had no reasonable basis for choosing this law....

When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when this state is that where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business. The same will also be the case when this state is the place of contracting except, perhaps, in the unusual situation where this place is wholly fortuitous and bears no real relation either to the contract or to the parties. These situations are mentioned only for purposes of example. There are undoubtedly still other situations where the state of the chosen law will have a sufficiently close relationship to the parties and the contract to make the parties' choice reasonable.

(Italics in original).[85]

In short then, this Court is not in a position to invalidate the parties' choice, with respect to the construction and en-

84. The comment goes on to add an additional rationale: "Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations." *Id.*

85. In this regard, it is perhaps significant to note that New York statutory law permits parties in large commercial contracts to invoke New York law to govern their rights and duties *whether or not* their contract bears a reasonable relation to New York. *See* N.Y. General Obligations Law § 5–1401. The statute provides, in relevant part (and with exceptions, *inter alia*, for contracts relating to labor or personal services and personal, family or household services), that:

> The parties to any contract, agreement or undertaking ... in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than [$250,000] ... may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state.

It goes on to provide that nothing in it "shall be construed to limit or deny the enforcement of any provision respecting choice of law in any other contract, agreement, or undertaking." If New York finds it appropriate for contracting parties to agree to the applicability of New York law even in the absence of a nexus to New York, and goes on to provide that its statute does not limit or deny the enforcement of any other provisions respecting choice of law, this Court is comfortable in believing that New York would hardly be offended by the parties' like choice of the law of another state, especially where a real, even if not predominant, nexus with the other state is present.

forcement of their contract, of the law of Illinois. Even though, if they had chosen the law of New York, that decision likewise would have been honored by this Court, their choice of the law of Illinois will be honored here.

### B. *Scope of Contractual Choice–of–Law Provision*

Having determined that the contractual choice-of-law clause will be honored here, the Court then must turn to the next issue—honored as to which claims?

The scope of the parties' agreement to abide by Illinois law appears in their contractual language. It reads, in relevant part:

> *This Agreement* and *the other Financing Agreements*... shall be construed in all respects in accordance with, and governed by, all of the provisions of the [Illinois Uniform Commercial] Code and by the other internal laws (as opposed to conflicts of law provisions) of the State of Illinois....

(Agreement ¶ 10.7) (emphasis added).[86]

That language, particularly when one takes the definitional cross reference to "Financing Agreements" into account, is about as broad as this Court can imagine when it comes to covering any actual or alleged agreement or contract. However,

it is notably silent in covering matters other than agreements between the parties. It does not, by way of example, say what it easily could have—saying, in words or substance, that "any and all dealings between the parties with respect to the financing," or that "any dispute between the parties with respect to the subject matter of the financing," shall be governed by Illinois law. The Court must thus consider what, if any, claims other than those arising under the contract (or calling for construction of the contract) should properly be regarded as covered under this clause.

■■■ At one extreme, one of the Committee's claims (# 8, which alleges violation of an implied covenant of good faith and fair dealing) seeks to enforce that covenant; if it is to be done, it must be done as an additional term of the Agreement. *Cf. Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1106 (7th Cir.1997) (claim for breach of implied covenant of good faith and fair dealing was within breach of contract claim, and did not stand alone as its own claim). The choice-of-law issue with respect to that claim is not a difficult one; this Court has little doubt that if, as the Court now has ruled, Illinois law governs the contract and the manner in which it is construed, it is no jump at all to find that

---

**86.** The other "Financing Agreements" to which reference was there made is a defined term, whose definition appears in § 1.1 of the Agreement. It provides, in relevant part:

> *"Financing Agreements"* shall mean, collectively, this Agreement, the Revolving Notes, the Swingline Loan Note, Parent Guaranty, the Intellectual Property Security Agreements (if any), the Parent Pledge Agreement, the Blocked Account Agreements and all other agreements, instruments and documents, including, without limitation, security agreements, loan agreements, notes, guaranties, mortgages, deeds of trust, agreements, documents, instruments, pledges, powers of attorney, consents, assignments, contracts, notices, leases, financing statements and all other written matter whether heretofore, now, or hereafter executed by or on behalf of [Lois/USA] or any Borrower, any Subsidiary or any other Person and delivered to the Agent or any Lender in connection with this Agreement, together with all agreements and documents between Parent or any Borrower or any Subsidiary and the Agent [Green Tree] or any Lender referred to therein or contemplated thereby, as the same may hereafter be amended, modified or supplemented from time to time.

any efforts to engraft implied terms into the Agreement (or to construe them) should be measured under the law of Illinois.

■ After that, however, it becomes more difficult. At the other extreme are claims (# 4, Fraudulent Misrepresentation; # 5, Fraud; and # 6, Negligent Misrepresentation) which are plainly in the nature of tort.[87] The parties are in disagreement as to whether the parties' contractual choice-of-law clause fairly can be read to cover those claims as well. As the Second Circuit held in *Krock, supra:*

> Under New York law, a choice-of-law provision indicating that the *contract* will be governed by a certain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract.

97 F.3d at 645 (italics in original).

Numerous decisions of the Second Circuit and of District Courts in this district, all construing New York law, make clear that while a contractual choice-of-law provision will normally be enforced, if it is to cover claims other than those in contract, it must have been drafted sufficiently broadly to say so. *See Krock,* 97 F.3d at 645 ("Although New York law gives full effect to parties' choice-of-law provisions," citing *Woodling,* "the language in the loan documents between [the parties] does not apply to the case at hand."); *Lazard Freres & Co. v. Protective Life Insurance Co.,* 108 F.3d 1531, 1540 (2d Cir.1997), *cert. denied,* 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997) (District Court rightly concluded that the choice-of-law provision in the contract should not control, because, under New York law, a contractual choice-of-law provision governs only a cause of action sounding in contract, not one sounding in tort); *Plymack v. Copley Pharm., Inc.,* 1995 WL 606272 at *5 (S.D.N.Y.1995) (Wood, J.) (Under New York law, "[a] contractual choice-of-law provision ... does not bind the parties with respect to non-contractual causes of action"); *Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1150 (S.D.N.Y.1989) (Conner, J.) ("While [a choice-of law] provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort."). *See also Knieriemen v. Bache Halsey Stuart Shields, Inc.,* 427 N.Y.S.2d 10, 12–13, 74 A.D.2d 290, 293 (1st Dep't 1980) ("That the parties agreed that their contract should be governed by an expressed procedure does not bind them as to causes of action sounding in tort."). *See also Turtur, supra* and *infra,* 26 F.3d at 310 (applying that same principle, but determining that the contractual language "is sufficiently broad to cover tort claims as well as contract claims").[88]

---

87. Rescission is not sought as a remedy under any of these claims, thereby eliminating the need for the Court to consider whether claims for rescission of a contract should be regarded as predominantly raising issues of contract law.

88. Thus, it is possible that under New York's choice-of-law rules, the law of different jurisdictions can apply to the contract claims and the tort claims in a given action. *Lazard Freres & Co., supra,* 108 F.3d at 1540; *see also, e.g., Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp.,* 80 F.Supp.2d 129, 135 (S.D.N.Y.1999) (Cedarb-

aum, J.) (applying Texas law to negligence, breach of fiduciary duty and contract claims where most activity and defendant's principal place of business were located in Texas and applying Delaware law to claim for aiding and abetting a breach of fiduciary duty, where defendant was incorporated in Delaware); *Chapelle v. Beacon Communications Corp.,* 1993 WL 465312, *1, 1993 U.S. Dist. LEXIS 15979, *6 (S.D.N.Y.1993) (Mukasey, C.J.) (applying California law to sexual harassment and contract claims and New York law to emotional distress and assault claims), *appeal dismissed,* 84 F.3d 652 (2d Cir.1996); *Rosenberg, supra,* 718 F.Supp. at 1150 (concluding

In *Krock*, as here, the Second Circuit confronted the issue of claims of fraud with respect to a contract with a choice-of-law clause. It noted that:

> Under New York law, in order for a choice-of-law clause to apply to claims for tort arising incident to the contract, the express language of the provision must be "sufficiently broad" as to encompass the entire relationship between the contracting parties.

97 F.3d at 645.

Decisions in the Second Circuit and in the Southern District of New York—all starting with the proposition that a contractual choice-of-law clause would be honored, but only with respect to the claims that it covered—have focused on the breadth of the choice-of-law clause to measure its scope. In *Krock, supra,* the Second Circuit found that the contractual language there was insufficiently broad to cover claims in fraud as well as those in contract, and thus approved the District Court's decision to apply a different state's law to the tort claims. By contrast, in *Turtur, supra,* the Second Circuit—applying the exact same principles—found the contractual language sufficiently broad to cover both kinds of claims. The difference in result in those two cases was explained by District Judge Lewis Kaplan in *Schuster v. Dragone,* 67 F.Supp.2d 288 (S.D.N.Y. 1999).[89] Describing the general principle,

and then comparing *Turtur* and *Krock,* he observed, in relevant part:

> The effect of a governing law clause in circumstances like this depends on its breadth. In *Turtur...*, the Second Circuit considered a provision that said
>
> > "this note shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts ... The parties hereby consent to the exclusive jurisdiction of the courts of the State of New York to resolve any controversy or claim arising out of or relating to this contract or breach thereof."
>
> There the Circuit found the "language ... sufficiently broad to cover tort claims as well as contract claims 'arising out of or relating to'" the contract. On the other hand, in *Krock v. Lipsay,* ... the Circuit concluded that a clause providing more narrowly that "this Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of the State of Massachusetts" did not encompass fraudulent misrepresentation claims. The question, as the *Krock* court wrote, is whether "the express language of the provision ... [is] sufficiently broad' as to encompass the entire relationship between the parties."

*Id.* at 290 (footnotes omitted).

Another of those cases, also evidencing the importance of parsing the contractual

---

New York choice-of-law provision effective only as to breach of contract claims and applying Massachusetts law to tort claims of fraud, breach of fiduciary duty and tortious interference); *Knieriemen, supra,* 427 N.Y.S.2d at 12–13 (stating fact that parties agreed their contract should be governed by New York law does not bind them to tort claims, for "there is no reason why all must be resolved by reference to the law of the same jurisdiction").

**89.** There too a plaintiff made claims in fraud with respect to a transaction that had a

choice-of-law provision—there, in a promissory note that said "[t]he laws of New York State shall apply." Judge Kaplan declined to apply New York law to the claims of fraud. He held, as a second reason for reaching the conclusion he did, that:

> [W]hile the parties did agree that New York law would govern the 1997 promissory note, the fourth cause of action is not based on the note. Rather, the essence of the claim is that plaintiff was induced by defendants' fraud to loan the money for which defendants gave the note.
> *Id.* at 290.

language, is the decision in *Bon Jour Group, Ltd. v. Elan–Polo, Inc.,* 1997 WL 401814 (S.D.N.Y.1997) (Leisure, J.)—a case not the same as ours on its facts, but nevertheless quite comprehensive in its discussion insofar as relevant to this Court's concerns. There the *Bon Jour* court was faced with a license dispute involving both breach of contract and fraud claims.[90] As here, the choice-of-law clause was narrow; it provided that:

> The parties agree that this Agreement shall be governed by and interpreted pursuant to the Laws of the State of New York.

*Id.* at *4 n. 6.

However, unlike our case, the forum selection clause there was also rather narrow. It provided, in material part, that:

> In the event of litigation between the parties concerning the alleged breach of this Agreement or the meaning, effect, application and/or interpretation of its terms, for the purpose of such litigation each party consents to the jurisdiction of the Supreme Court of the State of New York in and for the County of New York.

*Id.* at *2.

The *Bon Jour* court first considered a forum selection dispute; it ruled that the forum selection clause was enforceable, but it noted its limitations—essentially the same we have here. It observed that in contrast to a clause in a Texas case that had been cited as precedent, covering "any suits or causes of action arising directly or indirectly from this Agreement," which had been held to be broad enough to cover tort claims:

> [T]he clause in the [agreement before the *Bon Jour* court] does not employ such broad language as "any litigation"; rather, it limits its coverage to claims for breach of contract and interpretation of terms.

*Id.* It therefore held that the forum selection clause would be limited in effect to claims within its scope:

> The forum selection clause at issue explicitly and clearly addresses breach of contract claims and attorney fees that arise out of such claims, and therefore the Court finds that the Contract Claim should be remanded to the state court. However, the scope of the clause does not cover tort-based claims such as fraudulent inducement. The forum selection clause does not mandate that Bon Jour litigate non-contractual claims in New York state court, and therefore the Court finds the forum selection clause inapplicable to plaintiff's Fraud Claim.

*Id.*

The *Bon Jour* court then engaged in a like analysis with respect to the choice-of-law issue. It noted that the Agreement stipulated that the applicable law was that of New York, but in order for the choice-of-law clause to apply to the Fraud Claim, the language of the clause had to encompass tort-based claims such as fraudulent inducement. *Id.* at *4 n. 6 (citing *Krock*). It noted that "[e]xamples of such broad language are comparable to the language this Court found necessary in order for the instant forum selection clause to have applied." *Id.*

As Judge Kaplan noted in *Schuster,* "[t]he question, as the *Krock* court wrote, is whether the 'express language of the

---

90. The case was complicated further by reason of a prior pending action in Missouri, and a desire by one litigant to remand the New York federal action from federal court in New York to the Supreme Court, New York's state court of general jurisdiction, but for the most part these matters are not germane to this issue.

provision ... [is] sufficiently broad' as to encompass the entire relationship between the parties." 67 F.Supp.2d at 290. That is the test this Court must apply here.[91] The question here, as in *Krock, Turtur, Schuster,* and *Bon Jour,* is whether the language of the Agreement "[is] sufficiently broad' as to encompass the entire relationship between the parties." *Id.*

In our case the terms of the Agreement's choice-of-law clause, § 10.7, captioned "Applicable Law," do not cover claims in fraud, a tort. And just as this Court was reluctant to rewrite the Agreement to delete the choice-of-law clause, it is reluctant to rewrite the Agreement to broaden the choice-of-law clause's scope to cover claims that the choice-of-law clause did not address.

■ In this regard, however, there is another issue: to what degree should this Court consider language in a *forum selection* clause to add to, and/or modify, the terms of the *choice-of-law* clause? While Green Tree does not contend that the choice-of-law clause is sufficiently broad to cover claims other than those in contract, it relies on another clause, in a different section of the Agreement, captioned "Submission to Jurisdiction; Waiver of Jury and Bond." (Agreement § 10.8). That provision, which is quoted in full above,[92] provides in substance that any actions "*relating to* this Agreement or the other Financing Agreements" are to be litigated in the Illinois courts. (Block caps deleted; italics added). This language (in contrast to the language in the choice-of-law clause, § 10.7) is sufficiently broad to cover the

fraud claims relating to statements made in connection with the financing that ultimately was documented in the Agreement, but it is in a separate part of the Agreement—and in a forum selection clause, not the choice-of-law clause.

The choice-of-law clause does not address the court or courts in which the law is to be applied, and the forum selection clause does not address the law the chosen forum is to apply when the chosen forum— unlike as in the case here—hears the case. Among many other things, the former goes much more to the parties' substantive rights, and the latter goes much more to the parties' litigation needs, and in particular, the place where, and procedures under which, their substantive rights are determined. A choice-of-law clause and a forum selection clause are not the same, and address different needs and concerns.

However, Green Tree notes that in two cases (one decided by the Second Circuit), language in a choice of *forum* clause was applied to determine the scope of a choice-of-*law* clause. *See Turtur, supra,* 26 F.3d at 309–310; *Bibeault v. Advanced Health Corp.,* 1999 WL 301691, *6, 1999 U.S. Dist. LEXIS 7173, *17 (S.D.N.Y.1999) (Ward, J.) (following *Turtur*). Thus, Green Tree argues, in each case broader language in the forum selection clause was considered relevant in determining the coverage of the choice-of-law clause.

In *Turtur,* the contract provided:

[T]his note shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts

---

91. While the Court does not disagree with Green Tree's point that the result in *Schuster* ultimately was based on conflicts of law rules of the State of Connecticut (after a transfer from Connecticut to New York, and following principles in *Klaxon, supra,* and *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), *see* 67 F.Supp.2d. at 290

nn. 2–3), this Court notes that incident to its analysis, the *Schuster* court first discussed the Second Circuit's New York law decisions, and then noted that the "Connecticut courts conduct the same inquiry." *Id.* at 290.

92. *See* n. 8 above.

made and to be performed therein without giving effect to the principles of conflict of laws. The parties hereto consent to the exclusive jurisdiction of the courts of the State of New York to resolve any controversy or claim arising out of or relating to this contract or breach thereof.

26 F.3d at 309.[93]

Without parsing the two sentences of that paragraph, Green Tree argues that the *Turtur* court "rejected the argument that such language only covered contract claims, specifically holding that 'this language is sufficiently broad to cover tort claims as well as contract claims.'" [94] That contention clearly is correct in terms of the *Turtur* court's bottom line; the *Turtur* court used language in the second sentence of that paragraph—the forum selection clause—to broaden the scope of the first sentence, the choice of law.[95] However-

er, Green Tree does not argue, and review of *Turtur* does not suggest, that the parties in *Turtur* briefed or argued whether language in a forum selection clause properly should be deemed to modify the choice-of-law clause, or that the *Turtur* court ruled on that issue or focused on it.[96]

Needless to say, decisions of the Second Circuit are binding on this Court. However, here we have two decisions of the Second Circuit, *Krock* and *Turtur*, which, while not inconsistent,[97] tend to send this Court in different directions. If, as Green Tree argues, provisions in different sections of the Agreement, dealing with different concepts, are thrown into a single pot, the forum selection clause would make Illinois law applicable to tort (as well as other non-contract) claims as well. If, on the other hand, this Court follows the Second Circuit's directive in *Krock*—to determine whether the "express language of the provision . . . [is] sufficiently broad' as to

---

93. Likewise, the contract in *Bibeault*, the decision of the District Court that relied on *Turtur*, stated:

> The parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of New York. The parties hereby agree that any dispute which may arise between them arising out of or in connection with this Subscription Agreement shall be adjudicated before a court located in New York City, and they hereby submit to the exclusive jurisdiction of the courts of the State of New York ... with respect to any action or legal proceeding commenced by any party ....

1999 WL 301691 at *6, 1999 U.S. Dist. LEXIS 7173 at *16.

94. Green Tree Br. # 2 at 6.

95. The *Bibeault* court (faced with a paragraph that it regarded as "nearly identical to that in *Turtur*," 1999 WL 301691 at *6, 1999 U.S. Dist. LEXIS 7173 at *18), did likewise. It does not appear that the parties argued, or that the *Bibeault* court addressed, the fact that the second sentence of that paragraph was a forum selection clause.

96. Arguably supporting the Committee here, the *Bon Jour* court cited the contractual language in *Turtur* as an example of the broader language that was necessary to craft a broader choice-of-law clause; however, the *Bon Jour* court did not need to address, and did not address, the fact that the language upon which the *Turtur* court had relied was taken from the forum selection clause and applied to the choice-of-law clause.

97. Green Tree observes that in *Krock*, which held that a choice-of-law clause applicable to contract claims should not be read as applying also to claims in tort, there was no additional language of the type present in the forum selection clause here, and the parties' intent could be gleaned solely from a reading of the choice-of-law clause. Conversely, it does not appear that the *Turtur* court was asked to, or did, consider whether *Krock's* directive. that the parties' contractual intent be implemented made consideration of a different clause, relating to a different issue, relevant to that intent.

encompass the entire relationship between the parties"—this Court must parse the choice-of-law clause to determine what it said, and consider the forum selection clause's broader coverage only with respect to any effort by the Lenders to rely on it with respect to an appropriate *forum selection*.

Here the choice-of-law clause and the forum selection clause are not only distinct; they are in separate sections of the Agreement. Understandably, Green Tree does not argue that the choice-of-law clause, found in § 10.7, is broad enough to cover claims in tort. Nor does it argue that the language in the forum selection clause section of the Agreement, § 10.8, is informative with respect to the parties intent as to their choice of law. Because, without discussing whether they should, two courts (including one whose decisions are binding on this Court) merged the two clauses, and did not focus on the distinctions between the two, Green Tree asks this Court to do likewise.

This Court believes that it cannot do so consistent with *Krock*. Where, as here, the Second Circuit in *Krock* has given the lower courts a clear directive to determine the parties' intent, and it does not appear that the Second Circuit in *Turtur* gave the lower courts a directive to consider forum

selection clauses as fungible with choice-of-law clauses, this Court believes that it must follow *Krock*. It holds, accordingly, that the choice-of-law clause does not cover claims in tort.[98]

### C. Choice of Law for Particular Claims

Having determined that the choice-of-law clause covers contract claims alone, the Court then turns to the appropriate alternative choice of law applicable to each of the claims. Those decisions turn on whether the contractual choice of law covers the claim in question, and, if it does not, traditional conflicts of law analysis applicable to issues for which there has been no effective contractual choice of law. To the extent not previously discussed,[99] the Court's analysis in that regard follows.

#### 1. Promissory Estoppel (Claim for Relief # 1)

The Committee's claim based on promissory estoppel is in substance a claim that an alternative contract should be found to exist, or at least that promises not embodied in the final Agreement should be enforced. The enforcement of promises is the meat of contract. Likewise, the enforcement of any promises not embodied in the final contract is subject to the contract itself, where, as here, the contract express-

---

**98.** To the extent that such is not obvious from the preceding discussion, this Court notes that it has declined to apply the contractual choice of law to tort and other non-contractual claims not because there is anything inherently objectionable in parties agreeing to such, but because, on a fair reading of the Agreement, they did not here agree to it. The parties could easily have drafted § 10.7 to provide for a broader scope of their choice-of-law clause, and if they had done so (saying, for example, that Illinois law would apply to any claim or dispute between the parties, or would govern the totality of their relations), such an agreement, this Court expects, would (subject to any *Restatement* § 187 limitations discussed above) be enforced. It is only be-

cause they failed to do so here that this Court finds it necessary to apply the choice-of-law principles applicable to a determination in the absence of an effective choice of law.

**99.** There is no need for further discussion of Claim for Relief # 8 (breach of the implied covenant of good faith and fair dealing), as, for the reasons noted at page 35 above, the choice-of-law agreement applicable to contract claims plainly applies to such claims. Similarly, discussion of Claim for Relief # 3 (equitable subordination) is omitted, for, as noted above, it is undisputed that federal law applies to that claim.

ly provides for the extent to which it supersedes any other agreements.

Thus the Court considers a clause of the Agreement, captioned "Entire Agreement" and relating to earlier representations, understandings and agreements (the "Entire Agreement Clause"),[100] relevant not just substantively, but also to the Court's determination with respect to the law under which any earlier agreements should be enforced. Without prejudging, for conflicts of law purposes, the substantive significance of that clause, the Lenders should be free to argue that the Agreement's Entire Agreement Clause is determinative, or at least relevant, to the Committee's efforts to enforce alleged earlier agreements or promises. As this Court has ruled, the Lenders have a right to have the Agreement—including, obviously, its Entire Agreement Clause—construed under the law of Illinois. Fairness and logic require that the totality of efforts to enforce agreements or promises in contravention of the Entire Agreement Clause, or in light of it, likewise be governed under the law of Illinois.

Indeed, at least where, as here, Lois and the Lenders agreed to *both* the Entire Agreement Clause and the Agreement's choice-of-law provision—providing that the Agreement and the other Financing Agreements would be "construed ... in accordance with" and "governed by" the law of Illinois—applying the law of another jurisdiction to claims having the purpose or effect of circumventing that clause would undermine, or at least raise a substantial risk of undermining, that combination of contractual agreements. Once

more, this Court considers the predictability of contractual relations to be an important concern.

Thus, although this Court is aware that the parties' contractual choice of law was limited to the law by which the Agreement and the other Financing Agreements (which would not, by any fair reading, include any alternative agreement or promise that is alleged to have been made) were governed, this Court believes that holding alternative theories of contract or promise to be governed by the law of a different jurisdiction would materially undercut the parties' choice of the law of Illinois to govern their contract, and would materially impair the Lenders in arguing the relevance of a contractual provision— the Entire Agreement Clause—to which all parties to the Agreement had agreed.

Two other considerations reinforce the Court's decision in this regard. The first is that the parties' agreement that their contract would be construed under, and governed by, the law of Illinois suggests that any claims enforcing alternative promises, or otherwise in the nature of contract, likewise should be governed by the law of Illinois, for to do otherwise would lead to a risk of confusion and/or uncertainty. The second is that when Lois and the Lenders signed on to the law of Illinois to govern their contract, they knew or can fairly be charged with knowledge that the law of Illinois included Illinois statutory law applicable to contracts like the Agreement, such as the ICAA. It would be anomalous, and risk undercutting the purpose (or at least effect) of their

---

100. The Agreement provides, in § 10.15:

This Agreement, including all Exhibits, Schedules and other documents attached hereto or incorporated by reference herein, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all other negotiations,

understandings and representations, oral or written, with respect to the subject matter hereof, including, without limitation, that certain Proposal Letter dated as of February 24, 1999 between the Parent [Lois/USA] and GTFSC [Green Tree].

choice of law, to deprive them of the consequences of statutory law they might have intentionally wished to invoke.[101] While reliance on these additional considerations (which would apply even in the absence of an integration clause like the Entire Agreement Clause) may be unnecessary here (given the presence of an integration clause whose significance the parties should be free to argue), they provide additional comfort to this Court in dealing with the narrower set of facts with which it is presented here.

### 2. Breach of Fiduciary Duty (Claim for Relief # 9)

■ The claim for breach of fiduciary duty here (and in particular, the threshold allegation that the Lenders owed a fiduciary duty to Lois) is, in this Court's view, properly regarded as subject to the choice of law that the parties made applicable to their contract, i.e., the law of Illinois. The Committee has disclaimed any contention of fiduciary duty for the period preceding the formation of the Agreement.[102] For the period thereafter, it is at least appropriate, if not essential, to consider the contract that provides the context for the fiduciary duty claim. Where, in that contract, the parties have contractually agreed that they are not undertaking fidu-

ciary duties to each other, as Lois and the Lenders did here (the "Fiduciary Duty Clause"),[103] each has a contractual right— as the Court has ruled above, by the law of Illinois—to argue the relevance of the contractual Fiduciary Duty Clause, and/or to have its effect judicially determined. Thus, determining the existence of the fiduciary duty that is the underpinning of this claim necessarily requires consideration and construction of the Agreement, and/or any relevant policy of the state of Illinois with respect to whether provisions in agreements of the character of the Fiduciary Duty Clause are enforceable.

■ The Court reaches the same result using traditional conflicts of law analysis, based on an analysis of interests and contacts. If, upon execution of the Agreement, Lois placed trust and confidence in the Lenders, it did so in the context of the Agreement, if not as a consequence of it. Factors relevant to contract issues, when the contract was closed in Illinois (and when pre-contract promises and representations in New York constituting alleged fraud are much less relevant) have a much stronger nexus to the state of Illinois than those applicable to the claims in tort.[104] Additionally, the Court believes that in considering the relevant interests and con-

---

**101.** As an example, if the parties had chosen to invoke the law of New York to their contract (which, based on the contacts with this financing, likewise would have been upheld), their invocation of New York law could have been intended to invoke various provisions of New York's General Obligations Law. Applying the law of another jurisdiction under such circumstances might undercut the purpose or effect of such a choice.

**102.** *See Committee Br. # 1 at 37 ("[T]he Committee does not allege, and is not relying on, a pre-contract fiduciary duty here.").*

**103.** Agreement § 10.2 ("No provision contained herein or in any other Financing Agreement and no course of dealing between the parties shall be deemed to create any fiduciary relationship between the Agent [Green Tree] or any Lender and the Borrowers [Lois]."); *accord id.* § 10.19.

**104.** The allegations that a fiduciary duty existed relate to the post-Agreement phase, and, as noted, the Committee has stated that it does not assert the existence of a fiduciary duty with respect to the pre-Agreement phase. Thus the Court comes to the view described above even though it is well aware that the fiduciary duty claim is pleaded in very nearly the same words as the negligent misrepresentation claim, which, as noted below, the Court holds is subject to New York law.

tacts applicable to the claim of breach of fiduciary duty, it is appropriate to consider the risk that applying the law of a jurisdiction other than Illinois would subvert any contractual rights which, at least arguably, are conferred upon parties under the law of Illinois. The claim of breach of fiduciary duty will be governed by the law of Illinois.

### 3. Unjust Enrichment (Claim for Relief # 2)

 With one exception, requiring separate discussion, the reasons set forth with respect to the claims for promissory estoppel and for breach of fiduciary duty cause this Court to believe that the claim for unjust enrichment similarly should be governed by the law of Illinois. The exception is the presence of an additional factor—though it likewise suggests application of the law of Illinois.

The additional factor is that at least the great bulk of the consideration paid by Lois to the Lenders—the essence of the claim for unjust enrichment [105]—was paid under the Agreement,[106] and the rights, if any, to the return of that consideration cannot be considered without at least some consideration of the Agreement and its terms. The Court is sensitive to the fact that not all of what is or what might be argued to be consideration or enrichment to the Lenders was paid pursuant to the Agreement—e.g., some was paid back in or about February 1999, as a step incident to going forward with the financing and the drafting of the Agreement and the other Financing Agreements—but the entitlement to those payments (or the return of those payments) is subject to litigation to which the Entire Agreement Clause is or may be relevant. Since the Agreement, including its terms—e.g., the Entire Agreement Clause—is governed by the law of Illinois, once more it would be inappropriate to consider these claims to be subject to the law of another jurisdiction.

### 4. Bad Faith (Claim for Relief # 7)

 The Committee's bad faith claim, Claim for Relief # 7, is based on an amalgam of pre-and post-Agreement conduct. The Committee alleges that before the execution of the Agreement, the Lenders "wrongfully secured a superior bargaining position through inducement and delay so that they were able to dictate the terms of the credit facility,"[107] and that at that time "Lois had no choice but to rely upon and place its confidence on the relationship with the [Lenders]."[108] The Committee also alleges that after the execution of the Agreement, once Lois had pledged all of its assets, the Lenders placed additional restrictions on Lois' borrowing so that there was no possibility that Lois could continue its operations,[109] took no steps to provide relief to remediate Lois' financial crisis (which was caused by the limited availability under the facility), and, instead, imposed greater restrictions on the loan, and eventually declared a default and ceased normal funding.[110]

---

105. *See* Cmplt. ¶ 82 (Lenders collected approximately $860,000 in fees from Lois); it is not clear whether that includes or is in addition to $50,000 paid by Lois in advance of the drafting of the Agreement's definitive documentation (*see id.* ¶ 35), but either way, it substantially exceeds it.

106. E.g., the closing fee (presumably $600,000, *see* Cmplt. ¶ 53) and interest under the loan.

107. Cmplt. ¶ 145.

108. Cmplt. ¶ 147.

109. Cmplt. ¶ 150.

110. Cmplt. ¶ 151.

Especially in the absence of an allegation of an independent duty to Lois that was violated, the Court considers the allegations as to the post-Agreement phase to be variants of concerns as to the Lenders' performance under the Agreement (with or without reliance on an implied covenant of good faith and fair dealing), best regarded as sounding in contract, and subject to the parties' agreement to apply the law of Illinois to claims of that nature. Likewise, the allegations as to the pre-Agreement phase—again, in the absence of an allegation of an independent duty to Lois that existed at that time and was violated, and with recognition of the allegation of Lois' reliance upon expectations resulting from its relationship to the Lenders—are analogous, in this Court's view, to the allegations of promissory estoppel, which the Court has ruled should be governed by the law of Illinois.

Additionally, the viability of these claims cannot be considered without considering the potential effect of the Entire Agreement Clause, § 10.15 of the Agreement, which plainly must be construed under the law of Illinois.

Accordingly, the Court finds that Claim for Relief # 7, Bad Faith, must be considered, along with the other contract claims, under the law of Illinois.

5. *Tort Claims (Claims for Relief # 4 (Fraudulent Misrepresentation); # 5 (Fraud); and # 6 (Negligent Misrepresentation))*

In the absence of an effective choice of law applicable to tort claims, this Court looks to the relative contacts applicable to the underlying claims. This analysis is governed by *Restatement* § 188, and, more fundamentally, the cases construing New York law that hold similarly.

 To determine whose law governs the claims sounding in tort in the absence of an applicable choice-of-law provision, this Court, under the principles of *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), applies an "interest analysis" to determine which jurisdiction—New York or Illinois—has the greatest interest in such claims. *See, e.g., Krock, supra,* 97 F.3d at 645; *Bon Jour Group,* 1997 WL 401814 at *4. Specifically, this Court focuses on two matters to determine this greater interest: (1) what are the significant contacts, and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss. *See Krock,* 97 F.3d at 645 (New York makes clear that "contacts obtain significance only to the extent that they relate to the policies and purposes sought to be vindicated by the conflicting laws").

 As to the first inquiry—requiring identification of the significant contacts and the jurisdiction in which they are located—*Krock* is again relevant. The Second Circuit commented in *Krock* that in all interest analyses addressed to an alleged tort, "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Id.; see also Bon Jour Group,* 1997 WL 401814 at *4 (for tort claims, "the significant contacts are the parties' domiciles and the locus of the tort").

 The second inquiry requires consideration of the purpose of the rule of law whose choice of law is at issue, and in particular, whether its purpose is to regulate conduct or allocate loss. In the case of conduct-regulating laws—rules governing conduct to prevent injuries from occurring, *see Padula v. Lilarn Properties Corp.,* 84 N.Y.2d 519, 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001, 1002 (1994)—the law of the place of the tort generally will be determinative. *See, e.g., M.H. Segan L.P.*

*v. Hasbro, Inc.,* 924 F.Supp. 512, 522 (S.D.N.Y.1996) (Cote, J.) (where the law of fraudulent misrepresentation regulates conduct, the court should look to the "locus" jurisdiction). By contrast, cases involving loss-allocating rules—rules that prohibit, assign or limit liability after a tort occurs (such as charitable immunity statutes, vicarious liability statutes and contribution rules, *see Padula,* 84 N.Y.2d at 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001)—turn in significant part on the domiciles of the parties. *See Krock,* 97 F.3d at 646.

Here it is plain that we are faced with conduct-regulating rules of law—scrutinizing the conduct of the parties, and determining what is, or is not, actionable conduct. Thus, the Court looks to the choice-of-law rules applicable to rules of law of that character.

 As noted, the choice-of-law rules applicable to the determination of conduct-regulating rules of law—such as those determining what is tortious—look to the law of the place of the tort. For actions sounding in fraud, the substantive law of the state in which the injury was suffered—rather that the state where the fraudulent conduct was initiated—usually governs. *See Sack v. V.T. Low,* 478 F.2d 360, 365–66 (2d Cir.1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made").

 Based on these principles, the law to be applied with respect to the misrepresentation claims turns on the locus of the tort—or, implementing the rules for determining that—where Lois was located and sustained any alleged injury. "[A] cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence." *Sack,* 478 F.2d at 366. *See also Bon Jour Group,* 1997 WL 401814 at *4 (where the location of the alleged tort is not apparent, "the tort is deemed to occur where the party resides and sustained an economic loss resulting from the tort"); *In re Smith Barney, Harris Upham & Co. v. Luckie,* 85 N.Y.2d 193, 207, 647 N.E.2d 1308, 1316, 623 N.Y.S.2d 800, 808 (1995), *cert. denied,* 516 U.S. 811, 116 S.Ct. 59, 133 L.Ed.2d 23 (1995) (in context of applying New York's borrowing statute, N.Y. C.P.L.R. § 202, fraud claims are governed by the law "where the injury occurred—generally, the place where the investors resided and sustained the economic impact of the loss").[111]

Lois' headquarters and principal place of business were located in New York.[112] If Lois was wronged as a result of the alleged representations, it was injured in New York.

The law of New York, accordingly,[113] will be applied in determining the adequacy of

**111.** That requires application of the law of New York, rather than that of Georgia, even if it is true that allegedly wrongful conduct took place in Atlanta. Even more clearly, it makes it clear that New York law should be applied to the tort claims in contrast to the law of . Illinois.

**112.** Cmplt. ¶ 11.

**113.** While GECC argues for a contrary view under an "interests analysis" approach,

GECC inappropriately muddies the waters with respect to consideration of the parties' domicile (relevant principally, as noted above, to cases involving loss allocation) and the place of the alleged tort, and GECC ignores the caselaw, quoted above, providing guidance to courts in determining the place of the alleged tort—most notably that discussing the place of the alleged injury. Accordingly, GECC's arguments are not persuasive. Green Tree simply adopts GECC's "interest analysis" argument, and offers no additional

the Committee's allegations for fraud, fraudulent misrepresentation, and negligent misrepresentation.

## III.

*Legal Sufficiency of Individual Claims*

A. *Promissory Estoppel (Claim for Relief # 1)*

█ Underlying the Committee's promissory estoppel claim (Claim for Relief # 1) are a number of representations and/or promises allegedly made by the Lenders, upon which the Committee's further allegations rest, and where the failure to honor the alleged promises is the foundation of the Committee's claims. The most important of those allegations are that the facility would be in the amount of $45 million; that it would be "substantially similar" as the Sanwa facility; and that it would be made available by March 31, 1999. While in other places, other alleged representations/promises are

alleged, going into more detail (e.g., that the financing would permit the funding of both acquisitions and day-to-day operating expenses), they share the common characteristic of representing one or more alleged promises by the Lenders as what the financing facility then under discussion would provide,[114] which the Lenders thereafter failed to honor. Boiled down to their essence, the allegations as a whole are one or more promises, and failures, to lend.

The Lenders argue that under the law of Illinois (which the Court has now held governs the promissory estoppel claim), claims based on such promises are unenforceable, particularly where the alleged promises precede and are inconsistent with the Agreement that Lois and the Lenders ultimately entered into. In this connection, the Lenders call the Court's attention to the ICAA.[115] Section 2 of the ICAA provides:

---

argument for the application of Illinois law to the tort claims other than its argument, which the Court has found unpersuasive, *see* page 103 above, that the forum selection clause should be deemed to modify the contractual choice-of-law clause, and thereby cover tort claims as well. (*See* Green Tree Br. # 2 at 4–7 & n.6).

114. The Committee alleges, in that connection, that on February 23, 1999, Green Tree provided Lois with a proposal, set forth in a "Summary of Terms and Conditions" (the "Term Sheet") which Lois "accepted," and that Lois executed a letter "affirming Lois' direction to the law firm of Winston and Strawn *to commence the legal documentation relating to the loan*" and agreed to pay the bill for the related legal services. (Cmplt.¶ 35). The Committee has not argued that the Term Sheet (which is not in the record on this motion) constituted a binding agreement. Whether it was or was not would depend on the parties' intent, evidenced in no small part by what the Term Sheet and any accompanying documents said. *See, e.g., Teachers Insurance & Annuity Ass'n of America v. Tribune Co. ("TIAA–Tribune")*, 670

F.Supp. 491, 497 (S.D.N.Y.1987) (Leval, J., then a District Judge) ("As is commonly the case with contract disputes, prime significance attaches to the intentions of the parties and to their manifestations of intent.").

It appears, then, that at least by February 23, 1999, or shortly thereafter (within a few weeks of the time the alleged promises were made, and nearly four months before the financing actually closed), Lois knew that the ultimate financing would be evidenced by "the legal documentation relating to the loan." While this raises significant issues, noted by Green Tree (*see* Green Tree Br. # 1 at 6), as to the reasonableness of any pre-Agreement reliance when the parties knew that more definitive documentation would be prepared, the Court need not determine whether issues of that character properly can be considered on a 12(b)(6) motion in light of its determination on other grounds.

115. There is not, nor can there be, any dispute that if Illinois law applies to the promissory estoppel claim (as the Court has now ruled that it does), the alleged promises relate to a "credit agreement" to which the ICAA is

[a] debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.

815 ILCS 160/2.[116]

Significantly, the ICAA covers not just an action *"on"* a credit agreement; it also covers an action *"in any way related"* to one. By its terms, it covers both actions to enforce the promise itself to lend money (or to engage in the other described lender-borrower acts), and actions that "in any way relate[ ]" to such a promise. Courts that have considered the effect of the ICAA have construed it in accordance with its plain language, applying the ICAA to bar claims for promissory estoppel in connection with actual or alleged credit agreements, in the procedural context of motions to dismiss and for summary judgment. *See Whirlpool Financial Corp. v.*

*Sevaux,* 96 F.3d 216, 225–226 (7th Cir. 1996) (affirming summary judgment in favor of lender where ICAA barred affirmative defenses and counterclaims, including, among other things, promissory estoppel); *Help at Home, Inc. v. Medical Capital, L.L.C.,* 1999 WL 1269395, *3, 1999 U.S. Dist. LEXIS 19802, *7–*9 (N.D.Ill.1999) (granting motion to dismiss claims, including, among others, claims for promissory estoppel, arising out of alleged promise to extend credit, concluding that ICAA barred such claims); *General Electric Capital Corp. v. Donogh Homes, Inc.,* 1993 WL 524814, *3, 1993 U.S. Dist. LEXIS 17690, *7–*8 (N.D.Ill.1993) (granting lender's motion to dismiss guarantors' counterclaims that were based on oral agreement, including, among others, promissory estoppel); *Klem v. First Nat'l Bank of Chicago,* 275 Ill.App.3d 64, 66–68, 211 Ill.Dec. 828, 655 N.E.2d 1211, 1212–13 (2d Dist.1995) (affirming dismissal of various claims, including promissory estoppel claim).[117]

---

applicable. The ICAA defines a "credit agreement" as:

> an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards.
>
> 815 ILCS 160/1(1).

**116.** Likewise, Section 3 of the ICAA, which is captioned "Actions not considered agreements" provides, in relevant part:

> The following actions do not give rise to a claim, counter-claim, or defense by a debtor that a new credit agreement is created, unless the agreement satisfies the requirements of Section 2:
> (1) the rendering of financial advice by a creditor to a debtor;
> (2) the consultation by a creditor with a debtor; or
> (3) the agreement by a creditor to modify or amend an existing credit agreement or to

otherwise take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or rescheduling or extending installments due under an existing credit agreement.
815 ILCS 160/3. The Court believes that the actionable conduct alleged by the Committee is essentially of the character to which Section 2, rather than this Section 3, is applicable, but to the extent it is not, Section 3 covers them as well.

**117.** *See also Teachers Insurance & Annuity Ass'n of America v. La Salle Nat'l Bank,* 295 Ill.App.3d 61, 71, 229 Ill.Dec. 408, 691 N.E.2d 881, 888 (2d Dist.1998), *appeal denied,* 179 Ill.2d 621, 235 Ill.Dec. 577, 705 N.E.2d 450 (1998), *cert. denied,* 525 U.S. 1146, 119 S.Ct. 1043, 143 L.Ed.2d 50 (1999) (*"TIAA–LaSalle"*) (affirming summary judgment in favor of plaintiff TIAA on ground that ICAA barred counterclaims and affirmative defenses based on parties' alleged oral agreement to restructure written agreement); *Westinghouse*

While the Committee is vigorous in its argument that Illinois law should not apply, it makes only a modest showing of a basis for allowing the promissory estoppel claim to survive once Illinois law (and hence the ICAA) is determined to be applicable. As its first point, the Committee cites *Thomas v. National Canada Finance Corp.*, 1995 WL 54473 (N.D. Ill. Feb.7 1995)—a diversity case decided under Illinois law (and a relatively early case construing the ICAA, before there was substantial precedent under it)—for the proposition that the ICAA does not bar claims for promissory estoppel. Unquestionably, *Thomas* holds as the Committee says it does.[118] However, it appears that *Thomas* has not been cited or relied on since that time, and the Seventh Circuit (under Illinois law) and a considerable number of Illinois state cases (in its intermediate appellate courts), have held, expressly or impliedly, to the contrary—in connection with promissory estoppel claims and other equitable substitutes for enforcing a promise. *See Whirlpool Financial Corp.*, 96 F.3d at 225 (promissory estoppel); *Klem*, 275 Ill.App.3d at 66, 67, 211 Ill.Dec. 828, 655 N.E.2d at 1212, 1213 (promissory estoppel); *Donogh Homes*, 1993 WL 524814 at *2, *3 (promissory estoppel); *McAloon*, 274 Ill.App.3d at 763,

211 Ill.Dec. 281, 654 N.E.2d 1091 (equitable estoppel); *Machinery Transports*, 293 Ill.App.3d at 210, 227 Ill.Dec. 283, 687 N.E.2d 533 ("the fact that an action is grounded in something other than contract law does not change the applicability of the [ICAA]"); *McBride Chevrolet*, 267 Ill.App.3d at 372, 204 Ill.Dec. 676, 642 N.E.2d at 142 ("There is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement"). For that reason, this Court does not believe that it can appropriately regard *Thomas* as indicative of present Illinois law.

As its second point, the Committee notes Illinois caselaw where one of Illinois' intermediate appellate courts, *see Machinery Transports*, 293 Ill.App.3d at 210, 227 Ill.Dec. 283, 687 N.E.2d at 535–536, "recognizing the potential abuses of a strict application of the [ICAA], has urged the legislature to reconsider the harsh language of the [ICAA] as the 'strict application of this stature can easily lead to disastrous consequences in the hands of unscrupulous lenders.'"[119] Here too the Committee accurately conveys what the *Machinery Transports* court said, but the Committee fails to address the fact that

---

*Electric Corp. v. McLean*, 938 F.Supp. 487 (N.D.Ill.1996) (granting summary judgment, concluding that ICAA barred all guarantors' counterclaims and affirmative defenses, including fraud and good faith claims, whether sounding in contract or tort); *McAloon v. Northwest Bancorp, Inc.*, 274 Ill.App.3d 758, 764–765, 211 Ill.Dec. 281, 654 N.E.2d 1091, 1095–1096 (2d Dist.1994) (affirming dismissal of claims for equitable estoppel and fraudulent misrepresentation because they were barred under the ICAA); *First Nat'l Bank v. McBride Chevrolet*, 267 Ill.App.3d 367, 204 Ill.Dec. 676, 642 N.E.2d 138 (4th Dist.1995), *appeal denied*, 159 Ill.2d 566, 207 Ill.Dec. 515, 647 N.E.2d 1008 (1995) (affirming dismissal of counterclaims including breach of fiduciary duty, breach of implied covenant of good

faith and fair dealing and fraud, and concluding ICAA barred all actions based on an oral credit agreement).

**118.** The *Thomas* court stated:

Defendants have not cited, and this Court has not discovered, Illinois caselaw which interprets this statute as precluding plaintiff's right to an equitable remedy. Without precedent or evidence supporting defendant's contention, this Court does not believe it would be proper to interpret this statute in such a way as to prevent plaintiff from seeking equitable relief under the long recognized doctrine of promissory estoppel. *Id.,* at *5.

**119.** Committee Br. # 1 at 19.

the *Machinery Transports* said what it did while recognizing that, for better or worse, that was what Illinois law provided—"reluctantly agree[ing]" with earlier Illinois cases holding that "all actions relying on an oral agreement are barred by the [ICAA]." The *Machinery Transports* court said, in essence, that steps to address "disastrous" consequences that could result under this statute were a matter for the legislature, rather than the courts.[120] This Court (particularly as a federal court, sitting in what amounts to a diversity case) must hold similarly. *See McBride Chevrolet*, 267 Ill.App.3d at 372–373, 204 Ill.Dec. 676, 642 N.E.2d at 142 ("We recognize such an interpretation causes a harsh result for bank customers in some circumstances. The [ICAA] is very broadly worded, however, and dictates such a result"); *McAloon*, 274 Ill. App.3d at 765, 211 Ill.Dec. 281, 654 N.E.2d at 1095–1096 (same, *citing McBride Chevrolet*).

The Committee has failed to point to the requisite writing evidencing the promises it wishes to enforce, and (with the exception of the Agreement itself, which the Committee is not asking the Court to enforce, and which is inconsistent with the promises the Committee seeks to enforce here), the Court can find no document in the record, either in the Complaint or as referred to in the briefing on the motions, that complies with Section 2 of the ICAA. Accordingly, Claim # 1, for promissory estoppel, must be dismissed for that reason.

■ Additionally, while, under Illinois law, promissory estoppel can provide an alternative to consideration as a basis for treating a promise as a contractual undertaking,[121] a claim for promissory estoppel cannot be maintained where the alleged promise forming the basis of the claim is followed by a written contract containing different terms. *See All–Tech, supra*, 174 F.3d at 869 (affirming preclusion of claim for promissory estoppel where there was an express contract governing the relationship out of which the promise emerged). In *Mack v. Earle M. Jorgensen Co.*, 467 F.2d 1177 (7th Cir.1972), where the allegations were rather similar to those here, the Seventh affirmed the District Court's refusal to submit a promissory estoppel claim to the jury. The Seventh Circuit stated:

> We are not aware of any decision applying the doctrine of promissory estoppel where, as in the instant case, the alleged oral agreement or promise was followed by a written contract, the terms of which are in direct conflict with the alleged oral agreement or promise.

*Id.* at 1179.

For that reason too, the promissory estoppel claim, Claim # 1, is dismissed.

B. *Unjust Enrichment (Claim for Relief # 2)*

■ Under Illinois law, the theory of unjust enrichment is based upon a finding of a "contract implied in law," and requires

---

**120.** The *Machinery Transports* court observed that strict enforcement of the act would lead to a result that "is offensive to this court and would offend most of our citizenry as well. Therefore, we urge the legislature to reconsider the harsh language of the [ICAA] in light of the numerous potential abuses that may occur." *Id.* at 210, 227 Ill.Dec. 283, 687 N.E.2d at 536.

**121.** It has been said that promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. *See All–Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 868 (7th Cir. 1999) (noting this principle, and stating that where the promise is definite enough to induce a reasonable person to rely, the doctrine makes the promise enforceable).

a showing that the defendant has voluntarily accepted a benefit which it would be inequitable for him to retain without payment, since the law implies a promise to pay compensation when valuable services are knowingly accepted. *See, e.g., Premier Electrical Construction Co. v. La Salle Nat'l Bank,* 132 Ill.App.3d 485, 496, 87 Ill.Dec. 721, 477 N.E.2d 1249, 1257 (1st Dist.1984) (setting forth this principle and concluding trial court properly denied plaintiff's leave to amend complaint to include claim for unjust enrichment).

■ However, a claim for unjust enrichment cannot stand where there is an express contractual agreement. As the Illinois Supreme Court held in *La Throp v. Bell Federal Savings & Loan Association,* 68 Ill.2d 375, 12 Ill.Dec. 565, 370 N.E.2d 188 (1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978):

> [W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.

*Id.* at 391, 12 Ill.Dec. 565, 370 N.E.2d 188. *See also Perez v. Citicorp Mortgage Inc.,* 301 Ill.App.3d 413, 425, 234 Ill.Dec. 657, 703 N.E.2d 518, 526 (1st Dist.1998) ("The theory of unjust enrichment is based on a contract implied in law and, therefore, does not apply where there is a specific contract that governs the relationship of the parties.") (citing *People ex rel. Hartigan v. E & E Hauling, Inc.,* 153 Ill.2d 473, 497, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (1992) (concluding unjust enrichment was properly dismissed where an express contract governs the relationship of the parties)).

■ Additionally, the ICAA once more stands in the way of the Committee's unjust enrichment claim, which, as just noted, *see Premier,* 132 Ill.App.3d at 496, 87 Ill.Dec. 721, 477 N.E.2d 1249; *Perez,* 301 Ill.App.3d at 425, 234 Ill.Dec. 657, 703

N.E.2d 518, is based on a contract implied in law. The ICAA defeats all claims that are in any way related to a credit agreement, and the "fact that an action is grounded in something other than contract law does not change the applicability of the Act." *McAloon, supra,* 274 Ill.App.3d at 764, 211 Ill.Dec. 281, 654 N.E.2d 1091; *accord McBride Chevrolet, supra,* 267 Ill. App.3d at 372, 204 Ill.Dec. 676, 642 N.E.2d 138.

The Committee's claim for unjust enrichment is based upon allegations that the Lenders retained benefits under the Agreement ("receiving high returns on its investment in the credit facility with little risk"), and, possibly, in anticipation of the Agreement's execution. Either way, the claims for unjust enrichment—which are directly predicated on the Agreement, and plainly "related to" it—cannot survive under the ICAA.

For each of those reasons, the unjust enrichment claim, Claim for Relief # 2, is dismissed.

C. *Fraudulent Misrepresentation and Fraud (Claims for Relief # 4 and # 5)*

■ To decide the motions here, it is unnecessary to discuss all of the necessary allegations to plead a claim in fraud. The heart of the parties' dispute, at least on these 12(b)(6) motions, is the nature of the representations/promises that are alleged to be fraudulent.

The Lenders note that the claims of fraud and fraudulent misrepresentation that the Committee asserts here do not relate to assertions as to past or present facts, but to future events—representations as to what would happen in the future, and/or promises to be performed in the future. Such claims are not infrequently referred to as based on "promisso-

ry fraud." Especially given the context in which any such representations/promises were made (discussing the terms of undertakings that would be embodied in financing agreements to be executed down the road), Green Tree argues that claims based on such statements are not actionable.[122]

■ However, under the law of New York, which this Court has now held to cover the tort claims, promissory fraud is actionable. In New York, a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action. *See Channel Master Corp. v. Aluminium Ltd. Sales, Inc.,* 4 N.Y.2d 403, 407–408, 151 N.E.2d 833, 835, 176 N.Y.S.2d 259, 262 (1958); *Sabo v. Delman,* 3 N.Y.2d 155, 160, 143 N.E.2d 906, 908, 164 N.Y.S.2d 714, 716 (1957). A variant of that may also be actionable—where the statement is made "with the knowledge that the act will not be performed." *Landes v. Sullivan,* 651 N.Y.S.2d 731, 734, 235 A.D.2d 657, 660 (3rd Dep't 1997). As the New York Court of Appeals reiterated in *Channel Master,* quoting *Sabo:*

> [T]he allegations in the complaint describe a case where a defendant has fraudulently and positively as with personal knowledge stated that something was to be done when he knew all the time it was not to be done and that his

representations were false. It is not a case of prophecy and prediction of something which it is merely hoped or expected will occur in the future, but a specific affirmation of an arrangement under which something is to occur, when the party making the affirmation knows perfectly well that no such thing is to occur. Such statements and representations when false are actionable.

4 N.Y.2d at 407–408, 176 N.Y.S.2d 259, 151 N.E.2d 833.

■ In other words, allegations that a person or entity made a promise with a then-existing intention not to perform it support a cause of action in fraud under New York law. Numerous other cases, in New York's state and federal courts, have recognized this principle. *See, e.g., Chase Manhattan Bank N.A. v. Perla,* 411 N.Y.S.2d 66, 68, 65 A.D.2d 207, 210 (4th Dep't 1978) (allegation that defendant made a statement concerning a future act with the knowledge or intention that such act would not occur was sufficient to support action for fraud); *Thayer v. Dial Industrial Sales, Inc.,* 85 F.Supp.2d 263, 273 (S.D.N.Y.2000) (Conner, D.J.) (denying motion to dismiss fraud claim where facts alleged defendants made misrepresentations regarding compensation and ownership interest to induce plaintiff to work while knowing they did not intend to fulfill

---

122. *See* Green Tree Br. # 1 at 10–11 (stating that a statement of opinion or one that "relates to future or contingent events, expectations or probabilities," rather than pre-existent or present facts, ordinarily does not constitute actionable misrepresentation under Illinois law, and asserting that the only exception is false promises of future conduct that are part of larger scheme to defraud). Green Tree's argument, so far as the Court can determine, is based solely on Illinois law, and, of course, the argument (discussed and ultimately rejected above) that Illinois law should cover the tort claims as well. In this respect too, the arguments over the con-

flicts of law are understandable, as the Seventh Circuit has held that "*[u]nlike most states nowadays,* Illinois does not provide a remedy for fraudulent promises ('promissory fraud')—unless they are part of a 'scheme' to defraud." *Desnick v. American Broad. Cos., Inc.,* 44 F.3d 1345, 1354 (7th Cir.1995) (emphasis added).

GECC takes a slightly different tack, commenting on the lack of any allegations of any representations or promises, of any kind, that were made by GECC, and the failure to show that Green Tree was GECC's agent in the period before execution of the Agreement. (*See* GECC Br. # 1 at 23–25).

the promises); *The Matterhorn Group, Inc. v. SMH (U.S.) Inc., (In re Matterhorn Group, Inc.)* 2000 WL 1174215 *7 (Bankr. S.D.N.Y.2000) (Bernstein, C.J.) (statement of present intention was a statement of existing fact, and would support a fraud claim).

The Second Circuit, construing New York law, has likewise confirmed this, though stating the principle in the negative. *See Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made."); *Murray v. Xerox Corp.,* 811 F.2d 118, 121 (2d Cir. 1987) (same).

That is the allegation the Committee has made here. After alleging, in ¶ 111 of the Complaint (with an imperfect, but adequate, allegation that "Green Tree led Lois to believe"), that Green Tree in substance represented that Green Tree would provide a credit facility of $45 million under substantially similar terms as the Sanwa facility, the Committee continues:

> **123.** So far as the Court can discern, they differ only in that the first of them, Claim for Relief # 4 ("fraudulent misrepresentation"), bases its scienter allegations on an alternative theory of reckless disregard for the truth, in contrast to knowing misrepresentation, and this alternative scienter allegation does not appear in Claim for Relief # 5 ("fraud"). Normally, recklessness (as contrasted to negligence) is regarded as equivalent to knowing misstatement in the context of the scienter requirements for fraud. *See, e.g., Coolite Corp. v. American Cyanamid Co.,* 384 N.Y.S.2d 808, 811, 52 A.D.2d 486, 488 (1st Dep't 1976) ("False statements, recklessly made, without knowing whether they are true or false will support a fraud action."); *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.,* 379 N.Y.S.2d 873, 879, 51 A.D.2d 140, 145 (4th Dep't 1976) ("It is true that scienter, a necessary element of fraud, ... includes not only knowing falsehood but also 'a reckless indifference to error, a pretense of

At the time that Green Tree made such representations, Green Tree knew that the representations were false as it had no intention of entering into a facility of that size or under those terms with Lois. Cmplt. ¶ 113.

An allegation of that character meets the pleading requirements to state a cause of action under *Channel Master* and *Sabo.* Green Tree's motion to dismiss the two causes of action[123] premised on this doctrine is denied.

### D. *Negligent Misrepresentation (Claim for Relief # 6)*

Green Tree attacks Claim for Relief # 6, for negligent misrepresentation, on two grounds. It argues (1) that the Committee's allegation of reasonable reliance on the misrepresentations, while pleaded, cannot be taken at face value, because it could not have been reasonable as a matter of law,[124] and (2) that the claim is deficient for its failure to establish that Green Tree had the requisite duty upon which allegations of negligent misrepresentation could be based.[125]

> exact knowledge.' ") (internal quotes and citations omitted). If it is inadequate in the *Channel Master–Sabo* context, Green Tree has not argued that. At this point the Court will allow both claims to survive, as alternatives to each other.

> **124.** Green Tree Br. # 1 at 14–15.

> **125.** Green Tree Br. # 1 at 14, 15–16. Green Tree also argues, under Fed.R.Civ.P. 9(b), that the claims for negligent misrepresentation, like those for intentional fraud and misrepresentation, have not been pleaded with the requisite particularity; GECC attacks the negligent misrepresentation claim under Rule 9(b) as well. The Court's analysis of the Lenders' respective Rule 9(b) contentions (which it finds to have merit with respect to GECC, but not with respect to Green Tree) appears at page 101 below. By reason of that disposition, the Court addresses the legal suf-

Green Tree bases its arguments on the law of Illinois,[126] and for the most part—despite its contention that New York law governs the tort claims—the Committee responds under the law of Illinois.[127] However, as previously noted, the Court has determined that the viability of the tort claims, including the claim for negligent misrepresentation, must be gauged under the law of New York; Green Tree's contentions, which have similar basis under New York law, will be assessed accordingly.

### 1. Reliance

 New York law, like that of Illinois, has a requirement that any reliance on alleged negligent misrepresentations be reasonable. *See Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d

Cir.2000) (identifying, as one of the elements of a negligent misrepresentation cause of action, that "the plaintiff *reasonably* relied") (emphasis added).[128] Green Tree argues that reliance cannot be reasonable, as a matter of law, where the supposed misrepresentations "contradict the express terms of a written contract." [129]

However, the Committee responds that a distinction should be made between misrepresentations that are made in the context of a *then-existing* contract, and a contract that was not entered into until later. That distinction is understandable, as the reasonableness of any reliance by the recipient of the misrepresentations would have to be based on information as it was then known.[130] But that does not end the

---

ficiency of the negligent misrepresentation claim here.

**126.** Green Tree Br. # 1 at 13–15.

**127.** *See* Committee Br. # 1 at 35–37. In its surreply brief (Committee Br. # 2 at 14), the Committee cites one case under New York law, *New York Islanders Hockey Club, LLP v. Comerica Bank—Texas*, 71 F.Supp.2d 108 (E.D.N.Y.1999) (*"Islanders"*) (Spatt, J.), discussed, along with other New York authority, below.

**128.** The Second Circuit's recent decision in *Hydro Investors* set forth the elements of a cause of action for negligent misrepresentation. It stated:

Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.
*Id.* Two of those elements (1) the requirement of a duty, as a result of a special relationship,

to give correct information, and (5) the requirement that any reliance be reasonable, reflect the New York counterparts to the Illinois principles underlying Green Tree's motion, and are subject to dispute here.
Another requirement of New York law was thereafter mentioned by the *Hydro Investors* court—that the "alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition." *Id.* at 20–21. Once it has been determined, as the Court has determined here, that New York law applies, that requirement must also be considered here, and the Court does so below.

**129.** Green Tree Brief # 1 at 14, citing two cases under Illinois law, *Glass v. Kemper Corp.*, 133 F.3d 999, 1004 (7th Cir.1998), and *Gruen Industries v. Biller*, 608 F.2d 274, 282 (7th Cir.1979). The context of Green Tree's argument is that the final Agreement had terms that were very different than those that the Committee alleges that Green Tree represented to Lois, several months earlier, would be forthcoming.

**130.** Green Tree argues that a Seventh Circuit case cited by the Committee, *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201 (7th Cir.1998), in fact held that the plaintiffs could not establish reasonable reli-

analysis. Green Tree observes that each of *Glass* and *Gruen Industries* likewise addressed representations made *before* the contradictory contract was entered into,[131] and points out language in each questioning the legitimacy of reliance at a time when the prospective party knew that a later agreement was to be finalized.[132] That is a point that the Lenders should certainly be free to make, but the question is in what procedural posture in this adversary proceeding. Each of *Glass* and *Gruen Industries* made the above quoted comments not in the context of a 12(b)(6) motion, but rather on summary judgment, after a full factual record had been developed. In essence Green Tree argues, as

was successfully argued in *Glass* (but on a summary judgment motion), that any representations or promises were "*implicitly contingent upon the negotiation of a final contract,*" 133 F.3d at 1004 (emphasis added).[133] That might be so here too, and it might have been naive for business people to rely on the representations that are here alleged to have been made, but the Complaint makes allegations of *unconditional* promises, and it is inappropriate—particularly under *Conley*—to dismiss claims of that character on a motion under Rule 12(b)(6). The Court will not dismiss the negligent misrepresentation claim on this ground.

ance on *pre-contract* representations "when the contractual language was so explicitly to the contrary." (Green Tree Br. #2 at 23). While Green Tree is correct in describing the facts of that case and its bottom line, this is another instance where the basis for that bottom line, insofar as relevant, was not articulated by the court. In that case, part of the alleged promises and reliance took place prior to the execution of the contract, in September 1995, and part came thereafter. Though the decision is unclear, it is possible that although the contract between the plaintiff parents and the defendant adoption consultants was not signed until September 1995, its prospective *terms* were known earlier—since "[b]etween January and August 1995," one of the defendants, the adoption consultant's principal, "advised the [plaintiff parents] on the paperwork the [defendant adoption consultant] required." *Id.* at 1204. However, to the extent that communication did not include delivery of the contract to be executed or *disclosure of its terms,* and if the *Regensburger* court believed it had a basis for charging the plaintiffs with knowledge of the content of the contract when they had not yet seen it, the basis for that view was not articulated, and this Court is not prepared to hold similarly. When considering the reasonableness of reliance, this Court considers it appropriate to consider the terms of an inconsistent contract to the extent—but only the extent—that the party claiming reliance on the oral representations knows what the written contract says or will say. With respect, the Court declines to follow *Regensburger* to the extent

Green Tree relies on it for the proposition that reliance can be found to be unreasonable based on the terms of a contract whose terms have not yet been disclosed.

131. *See Glass*, 133 F.3d at 1004 (the "promise . . . was implicitly contingent upon the negotiation of a final contract containing it, so that until that contract was agreed upon it was unreasonable to rely on the promise," citing Illinois and Seventh Circuit cases); *Gruen Industries*, 608 F.2d at 281–282 (involving claims that promises gave rise to a binding interim agreement, and/or liability for promissory estoppel, under Wisconsin law).

132. *See, e.g., Gruen Industries*—noting again that it was an *estoppel* case:

Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement. It is difficult to find the degree of injustice necessary for recovery in estoppel when the promises incorporate so many contingencies and complexities and as a matter of sound business practice are to be formalized before the parties carry them out.

608 F.2d at 282.

133. If they were *expressly* so, Green Tree would be free to show that, but that is not the record on which the Court is deciding the current motions.

### 2. Duty

A more difficult question, however, is raised with respect to the existence of the required duty that triggers liability for negligent misrepresentation.[134] Under New York law, the party charged with the negligent misrepresentations must have a contractual duty to the other, or there must be some other basis for finding the duty in the context of the parties' dealings. *See White v. Guarente*, 43 N.Y.2d 356, 362–363, 372 N.E.2d 315, 319, 401 N.Y.S.2d 474, 478 (1977) (the author of the negligent misrepresentations must be "bound by some relation of duty, arising out of contract or otherwise"); *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 82 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981) (same); *Islanders, supra*, 71 F.Supp.2d at 119 (same, citing *Mallis*).

Noting that "not all representations made by a seller of goods or provider of services will give rise to a duty to speak with care," the New York Court of Appeals observed in *Kimmell, supra*, that:

> [L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.

89 N.Y.2d at 263, 652 N.Y.S.2d 715, 675 N.E.2d 450. The *Kimmell* court went on to say that to impose tort liability, "there must be some identifiable source of a special duty of care." *Id.* at 264, 652 N.Y.S.2d 715, 675 N.E.2d 450. The existence of such "a special relationship" may give rise to "an exceptional duty regarding commercial speech and justifiable reliance on such speech." *Id.*

In the Complaint (other than twice alleging, in conclusory terms, the existence of the required duty, without stating the basis upon which the alleged duty existed),[135] the Committee identified only one source or basis for the required duty: an alleged fiduciary relationship between Green Tree and Lois.[136] However, the Court cannot find the required duty based on this allegation. There is no basis in the record, in either the pre– or post-Agreement phases, for finding that the parties agreed to impose such a fiduciary duty on either of the Lenders; to the contrary, when they executed the Agreement, the Lenders and Lois expressly agreed that no fiduciary duty could be found to exist. Moreover, the Committee itself states that "the Committee does not allege, and is not relying on, a pre-contract fiduciary duty here."[137] Accordingly, and for the reasons noted below with respect to the "fiduciary duty" claim,[138] the Court finds that the requisite duty cannot be found to be based on the allegation of a fiduciary duty.

There remains the question as to whether the requisite duty can be based on anything else. Here, the factual context is a prospective borrower and lender discussing the terms of a future contract with

---

134. The existence of a duty is an issue of law for the courts. *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263, 675 N.E.2d 450, 453, 652 N.Y.S.2d 715, 718 (1996); *Eiseman v. State of New York*, 70 N.Y.2d 175, 187, 511 N.E.2d 1128, 1134, 518 N.Y.S.2d 608, 613 (1987). However, once the nature of the duty has been determined as a matter of law, whether a particular defendant owes a duty to a particular plaintiff is a question of fact. *Kimmell*, 89 N.Y.2d at 263, 652 N.Y.S.2d 715, 675 N.E.2d 450. Here this Court is considering the threshold issue.

135. *See* Cmplt. ¶¶ 127, 128.

136. *See* Cmplt. ¶ 130.

137. Committee Br. # 1 at 37.

138. *See* page 130 below.

respect to a loan, and where the borrower is allegedly relying on negligent representations as to what the contract then under discussion will provide. Our case does not involve a then-existing contractual or other legal relationship between the parties, a factor that was found to be significant by the New York Court of Appeals in the landmark case of *Ultramares v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, C.J.), which found the requisite duty lacking, insofar as a negligence claim was concerned, with respect to an accountant's report of its review of a balance sheet— even though it was foreseeable, and even expressly contemplated, that the accountant's report would be delivered to banks, creditors and other third parties. Nor does our case involve circumstances like those where one makes representations to another in the absence of privity, at the request or for the benefit of one with whom the speaker is in privity—"a relationship so close as to approach that of privity," *see Prudential*—such as the delivery of a legal opinion or measurement report, where it is contemplated that the plaintiff recipient will rely on it. *Compare Prudential, infra*, 80 N.Y.2d at 385, 605 N.E.2d at 322, 590 N.Y.S.2d at 835 (borrower's counsel who furnished legal opinion had a duty that ran to lender; relief

denied for other reasons); *White, supra*, 43 N.Y.2d at 362–363, 401 N.Y.S.2d 474, 372 N.E.2d 315 (accountants auditing limited partnership had a duty to an identifiable group of limited partners); *Glanzer v. Shepard*, 233 N.Y. 236, 239, 135 N.E. 275, 276 (1922) (Cardozo, J.) (public weigher, hired by the seller to weigh goods, realizing that the buyer would rely on his certificate to pay for them, had a duty that ran to buyer). Thus this Court must determine whether in the absence of either of those circumstances,[139] there is anything else upon which to ground the requisite duty.

In a discussion synthesizing the New York law at the time, the Second Circuit, speaking through Judge Friendly, noted in *Mallis* that "[r]ecent years have seen some advance from *Ultramares*, supra, the most restrictive of these classic decisions." 615 F.2d at 81–82. The *Mallis* court parsed the requirements for establishing liability for negligent misrepresentations as two: (1) were the allegedly negligent misrepresentations "expressed directly, with knowledge or notice that (they would) be acted upon," and (2) was the entity charged with the negligent misrepresentations "bound by some relationship of duty, arising out of contract or otherwise"? *Id.* at 82.

**139.** For that reason, the Court does not find *Islanders*, the New York case cited by the Committee (Committee Br. # 2 at 14)—for the proposition that a "bank has duty to be truthful"—to control a case like this one. There, a bank, at the request of its customer John Spano (who was proposing to buy the team), made written representations to the Islanders' owners about its customer Spano's assets, after a request for "proof from the heretofore unknown Spano that he had sufficient assets to acquire the team." 71 F.Supp.2d at 111. (The bank wrote that Spano maintained a net worth in excess of $100 million; that he was a valued customer of the Bank; and that he conducted his business in a satisfactory manner, when in fact he had no significant assets,

and had fraudulently misrepresented his net worth to the bank.). The *Islanders* court found such allegations to state a claim for negligent misrepresentation. *Id.* at 119. But *Islanders* is a classic implementation of the *Glanzer* principle, that when a party makes affirmative representations at the request of a customer with whom the recipient of the representations is in privity—and with the knowledge and intent that those representations will be relied on—the representing party can be held liable for negligence in making them. *Islanders* was a particularly easy case to come to that result, since the representations were in writing, and could have been made for no purpose other than inducing reliance.

In *Mallis* (where it was alleged that a bank had made representations at a closing for the sale of stock owned by its borrower and held by the bank as collateral), the Second Circuit ruled that the District Court should have submitted to the jury the negligent misrepresentation claim, predicated on representations allegedly made by the bank that facilitated the sale and partial repayment of the loan to the bank. While the Second Circuit noted as "true" that a literal reading of the language in *Ultramares* suggested that the New York courts would apply the more restrictive requirement of a formal legal relationship to claims based on negligent misrepresentation, it characterized the reference to a legal relationship in *Ultramares* as essentially dictum. In looking at the then-most recent decision of the Court of Appeals, *White*, the Second Circuit noted that "such conflict as there may be between *Glanzer* and *Ultramares* was not explicitly resolved." *Id.* at 83. The *Mallis* court thought it more appropriate to rely on *Glanzer*, which was also "more in consonance with the rule in other jurisdictions." *Id.*

▪ In language that spoke in terms of "buyers" and "sellers"—rather than in terms of the party making the representation, the party allegedly relying, and, where applicable, the customer or other party for whose benefit any representations were made—the *Mallis* court displayed a belief that the New York courts would henceforth base decisions on a duty

arising "out of contract or otherwise" on "the *Glanzer* notion of prevailing standards and buyer expectations." *Id.*[140] Since then, however, the New York Court of Appeals has continued to underscore the importance of the then-existing relationship between the parties. *See Eiseman, supra,* 70 N.Y.2d at 187–188, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (the relationship of the parties must be such that "the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care"). More concretely, the New York Court of Appeals has also stated:

> This Court has long held that before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity.

*Prudential Insurance Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 382, 605 N.E.2d 318, 320, 590 N.Y.S.2d 831, 833 (1992); *accord Eiseman,* 70 N.Y.2d at 188, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (stating that "in commercial actions for the negligent preparation of financial reports," the Court of Appeals had "further required" the actual privity or "something approaching privity" that was thereafter referred to in *Prudential*).[141] While that requirement would hardly be inconsistent with the bottom line result in *Mallis*—which in this Court's

---

**140.** It stated:

> Given the language of the few recent New York cases that have dealt with this issue, we predict that New York courts, when directly confronted with the issue, would hold that the Restatement's requirements that the seller be acting in the course of his business, that the information be supplied for the guidance of the buyer, and that the buyer justifiably relied on it, establish a

> sufficient relationship of duty between buyer and seller to support an action for negligent representation.
> *Id.*

**141.** *Prudential* involved a lawyer's opinion, rather than one for the negligent preparation of financial reports, but it was a hardly surprising extension and/or application of the earlier rule.

view would have been decided no differently with the benefit of the later decisions in *Eiseman* and *Prudential*[142]—it nevertheless requires courts to continue to focus on the contractual or other relationship between the party making the alleged misrepresentations and the party relying on them at the time the alleged misrepresentations are made. Significantly, "[f]oreseeability of injury does not determine the existence of duty." *Eiseman*, 70 N.Y.2d at 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128.

Does the relationship between a borrower and lender—and a *prospective* borrower and lender at that—satisfy those requirements? Though the New York Court of Appeals has not addressed the issue, numerous other courts have, and they have uniformly held that even an *existing* relationship between borrower and lender does not provide the requisite relationship to impose the duty necessary for a claim of negligent misrepresentation. *See Fab Industries v. BNY Financial Corp.*, 675 N.Y.S.2d 77, 78, 252 A.D.2d 367, 367 (1st Dep't 1998) (affirming dismissal of negligent misrepresentation claim; a factoring bank did not have the requisite "special or fiduciary relationship" with its customer); *Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*, 625 N.Y.S.2d 152, 154, 214 A.D.2d 359, 360–361 (1st Dep't 1995) (affirming grant of summary judgment on negligent misrepresentation defense asserted by guarantor of bank debt against bank); *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 252 (2d Cir.1985), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985) (affirming refusal of District Court to submit negligent misrepresentation claim to jury, in suit by bank customer against bank; under New York law); *Village on Canon v. Bankers Trust Co.*, 920 F.Supp. 520, 531–532 (S.D.N.Y.1996) (Koeltl, J.) (dismissing, under Rule 12(b)(6), negligent misrepresentation claim brought by borrower against its lender; under New York law).

As the First Department held in *Banque Nationale de Paris*:

> There is no fiduciary duty or privity of contract arising out of the contractual arm's length debtor and creditor legal relationship between a borrower and a bank which would give rise to a cause of action for negligent misrepresentation.

625 N.Y.S.2d at 154.[143]

*Durante Bros.* has some significant similarities to this case. There it was alleged that defendant Flushing National Bank negligently represented the Bank's willingness to lend plaintiff Durante $100,000. Relying on the principles described above, the Second Circuit affirmed a directed verdict in favor of the bank on that claim, finding the requisite duty of care missing. "An ordinary creditor-debtor relationship between bank and customer does not create such a duty of care." 755 F.2d at 252.

The Second Circuit went on to note:

> In the present case, no special relationship was shown between Durante and the Bank that could support a claim for

---

142. In *Mallis*, it will be recalled, the bank held the shares that were sold as collateral, and made the representations it allegedly made to facilitate the sale and the repayment of a loan it had made to its borrower.

143. Of course, a contractual relationship between a bank and its borrower does involve privity of contract in a sense in which privity of contract is frequently understood; it is obvious from the decision, however, that the First Department was referring to the special kind of relationship that would be necessary to create the requisite duty. *See* 625 N.Y.S.2d at 154 (denial of leave to amend answer to assert a negligent misrepresentation claim was proper, "in the absence of a confidential or fiduciary relationship between the borrower and the plaintiff bank").

negligent representation. Rather, as Durante's owner testified at trial, Durante was "trying to get more and more credit from the Flushing National Bank, *so eventually we could work . . . into* a regular banking relationship with the bank."

*Id.* (emphasis in original). It distinguished *Mallis* on factual grounds, and continued:

Durante has called to our attention no New York case, and we are aware of none, ruling that liability may be imposed on a defendant for a negligent promissory misrepresentation that could not give rise to liability for either fraud or breach of contract, where there was no special relationship between plaintiff and defendant.

*Id.* at 252–253.

Also instructive is *Village on Canon.* There the court considered, on a 12(b)(6) motion to dismiss, claims by borrower Village on Canon ("VOC") against its lender Bankers Trust alleging negligent misrepresentation arising out of the lender's failure to extend a bridge loan. According to the complaint, the borrower VOC, which had received a bridge loan from the lender Bankers Trust, "received oral assurances from Bankers Trust that the bridge loan would be extended if permanent financing was not arranged" before the maturity date of the bridge loan. 920 F.Supp. at 525. These assurances, according to the complaint, were negligently made, and the lender's failure to extend the loan, as the lender allegedly promised to do (combined with certain other allegedly wrongful conduct) caused the failure of the borrower's real estate venture.

The allegations were held to fail to state a claim upon which relief could be granted. The requirement of a "special relationship between the parties" was not satisfied. *Id.* at 531–532. Once more, based on the principles described above, the allegations failed to establish the requisite duty.[144]

*Durante Bros.* and *Village on Canon* found the requisite relationship lacking even though, in each case, the borrower was *already* in contractual privity with the lender, by reason of an earlier loan. In *Durante Bros.,* the $100,000 to be loaned was "in addition to amounts already loaned to it," 755 F.2d at 244, and in *Village on Canon,* the allegedly negligent representation was in the context of an extension of the then-existing loan agreement between borrower and lender. *See* 920 F.Supp. at 525–526. In our case, at the time the allegedly negligent representations were made, Lois and the Lenders had not even come into the borrower-lender relationship that was held to be inadequate in those cases. This case, then, is an even weaker case for finding the necessary relationship, and if the courts in *Durante Bros.* and *Village on Canon* were not in a position to find the requisite duty there, this Court

144. It has been held in New York that the "special relationship" or "duty" element of the cause of action may be satisfied by showing (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance. *See Islanders,* 71 F.Supp.2d at 119. While it may be that use of those standards is more appropriate in three-party cases of represen-
tations made by a speaker to a recipient for the benefit of a client or customer, such as *Prudential, Glanzer, Mallis* and *Islanders* (and is not very helpful in a two-party case like this one, where those allegations would be very easy to plead in conclusory terms, even in cases like *Durante Bros.* and *Village on Canon),* the Court does not have to decide whether it should limit application of those guidelines to three-party cases, since the Committee did not try, in its pleading, to bring itself within those standards.

plainly is not in a position to find the requisite duty here.[145] The Court will dismiss Claim # 6, for negligent misrepresentation, for failure to show the requisite duty.

### 3. Representations as to the Future

 The negligent misrepresentation claim must also be dismissed for another reason. While promissory fraud may be actionable if one makes a promise intending not to perform on it, allegedly negligent misrepresentations as to what will happen in the future have been treated differently by the New York courts. It has been repeatedly held in New York that "[p]romises of future conduct are not actionable as negligent misrepresentations." See Murray, supra, 811 F.2d at 123; Hydro Investors, supra, 227 F.3d at 20–21 ("[T]he alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition."); Sheth v. New York Life Insurance Co., 709 N.Y.S.2d 74, 75, 273 A.D.2d 72, 74 (1st Dep't 2000) ("The purported misrepresentations relied upon by plaintiffs may not form the basis of a claim for fraudulent and/or negligent misrepresentation since they are conclusory and/or constitute mere puffery, opinions of value or future expectations."); Bango v. Naughton, 584 N.Y.S.2d 942, 944, 184 A.D.2d 961, 963 (3rd Dep't 1992) (negligent misrepresentation claim was properly dis-

missed for failure to state a claim because the alleged representations were "mere expressions of future expectation"); Margrove Inc. v. Lincoln First Bank of Rochester, 388 N.Y.S.2d 958, 960, 54 A.D.2d 1105, 1107 (4th Dep't 1976) ("The alleged negligent misstatements all relate to promised future conduct, if misstatements they be, and there is a lack of any element of misrepresentation as to an existing material fact so as to come within the doctrine of negligent misrepresentation . . . .").

Here the fraud claims, which have not been dismissed, cover the possibility that Green Tree's promises of $45 million in financing, under the terms of the earlier financing, were made with the intent not to perform them, and/or knowing that they could not happen. Here, however, the claim is not one of fraud, but of negligence—that Green Tree failed to ascertain facts which, if discovered, would have caused it to have ascertained that its predictions of future events were unrealistic. That is a very different thing, and is not actionable in New York. The negligent misrepresentation claim is dismissed on that ground as well.

### E. Breach of the Implied Covenant of Good Faith and Fair Dealing (Claim for Relief # 8)

 Under the law of Illinois, which this Court has now held to be appli-

---

**145.** See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 819 F.Supp. 1282, 1293 (S.D.N.Y.1993) (Ward, J.) ("Neither an ordinary contractual relationship nor a banking relationship, without more, is sufficient to establish a 'special relationship,' which only occurs in the context of a previous or continuing relationship between two parties."), aff'd, 57 F.3d 146, 158 (2d Cir.1995); Estate of T.C. Sabarese v. First Nat'l Inv. Corp., 1994 WL 573320 at *4 (S.D.N.Y.1994) (Preska, J.) ("In the absence of contractual privity, a prior or continuing

association between the parties is also generally thought necessary."); Cumis Insurance Society, Inc. v. Citibank, N.A., 921 F.Supp. 1100, 1108–1109 (S.D.N.Y.1996) (Koeltl, J.) (dismissing claims of negligent representation arising from one bank's statements to another, where one bank had received a wire transfer from another; the relationship "fail[ed] to establish a relationship sufficiently approaching privity, particularly when compared to closer relationships which have been held insufficient to state a claim for negligent misrepresentation").

cable to this claim,[146] every contract contains an implied covenant of good faith and fair dealing. *See Echo, supra,* 121 F.3d at 1106; *RTC v. Holtzman,* 248 Ill.App.3d 105, 112, 187 Ill.Dec. 827, 618 N.E.2d 418, 424 (1st Dist.1993). These implied covenants may come into play where one party to a contract is vested with broad contractual discretion and requires that party to exercise that discretion "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.; accord Perez, supra,* 301 Ill.App.3d at 424, 234 Ill.Dec. 657, 703 N.E.2d 518 (quoting *Holtzman*); *Voyles v. Sandia Mortgage Corp.,* 311 Ill.App.3d 649, 655, 244 Ill.Dec. 192, 724 N.E.2d 1276, 1280 (2d Dist.2000) (quoting *Perez,* and noting that it quoted *Holtzman*); *TIAA–LaSalle, supra,* 295 Ill.App.3d at 73, 229 Ill.Dec. 408, 691 N.E.2d 881 (same).

As construed in Illinois, the term "good faith" has been held to refer to "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of the drafting, and which therefore was not resolved explicitly by the parties." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990) (setting forth this principal in the context of discussing inequitable conduct).

■ While under the law of Illinois there thus is doctrine, based on the implied covenant of good faith and fair dealing, upon which, given a proper state of facts, the Committee could proceed, there are nevertheless limits to the application of that doctrine. For one, it has been held in Illinois that courts will not permit implied agreements to overrule or modify the express contract of the parties, since "[e]xpress covenants abrogate the operation of implied covenants." *Holtzman,* 248 Ill.App.3d at 113, 187 Ill.Dec. 827, 618 N.E.2d 418 (affirming lower court and concluding affirmative defense of breach of the covenant of good faith and fair dealing was inapplicable).[147]

For another, where an alleged breach of such a duty is based upon an alleged oral credit agreement, courts have declined to extend the implied duty of good faith and fair dealing to that alleged oral agreement. *TIAA–LaSalle,* 295 Ill.App.3d at 74, 229 Ill.Dec. 408, 691 N.E.2d 881 (declining to extend the implied duty of good faith and fair dealing where party was attempting to "bootstrap the alleged breach of a duty of good faith and fair dealing stemming from the written credit agreement into an alleged breach of a duty of good faith and fair dealing arising from the purported oral credit agreement"); *Holtzman,* 248 Ill.App.3d at 113, 187 Ill.Dec. 827, 618 N.E.2d 418 (disallowing defendants' affirmative defense of a breach of the covenant of good faith and fair dealing where defendants' offer was not based on clear and concrete terms but rather rested upon speculation).

■ In our case, the Committee has alleged a variety of acts, after the execution of the Agreement,[148] that the Commit-

---

146. *See* page 97 above.

147. Even a case which, as discussed below, held, contrary to other Illinois caselaw, that violations of the implied covenant of good faith and fair dealing could result in a tort and not just a breach of contract, distinguished contrary caselaw on the ground that there "the terms of the contract on which the suit was based trumped any implied terms, such as the implied duty of good faith and fair dealing." *Voyles, supra,* 311 Ill.App.3d at 655–656, 244 Ill.Dec. 192, 724 N.E.2d 1276.

148. While the Committee, at the outset of its pleading of this Claim for Relief, realleged the allegations of all of the preceding 155 paragraphs of the Complaint (*see* Cmplt. ¶ 156), it made no reference, in its specific allegations of alleged breach of the implied covenant of

tee has alleged to be violative of the implied duty of good faith and fair dealing. In particular, the Committee alleges that:

Notwithstanding their commitment in the [A]greement, their knowledge of the condition of the business and despite Lois' efforts to reach an amicable resolution to Lois' financial situation, the [Lenders] in breach of the convenant [sic.] of good faith and fair dealing in the agreements, unjustifiably and without warning increased the borrowing restrictions, declared a technical default and eventually ceased normal funding.

(Cmplt.¶ 160).

With respect to this allegation, it is premature and inappropriate to speculate what the evidence will show. It is possible, however, that the Committee could show that the Lenders did not in fact exercise discretion afforded to them under the Agreement reasonably, or in a manner consistent with the reasonable expectations of the parties, *see Holtzman*, 248 Ill.App.3d at 112, 187 Ill.Dec. 827, 618 N.E.2d 418; *TIAA–LaSalle* at 73, 229 Ill. Dec. 408, 691 N.E.2d 881; or "[took] opportunistic advantage in a way that could not have been contemplated at the time of the drafting, and which therefore was not resolved explicitly by the parties," *Kham & Nate's Shoes No. 2*, 908 F.2d at 1357— matters which, if proven, might provide a basis for relief under Illinois law.

Reading the Complaint broadly, as *Conley* directs the lower courts to do, and mindful that the Court should not dismiss on a 12(b)(6) motion where there is any basis upon which the plaintiff might recover, the Court declines to dismiss Claim for

Relief # 8, for breach of the implied covenant of good faith and fair dealing, on these motions under Rule 12(b)(6). On this record, the Court cannot tell exactly what the Lenders did post-Agreement, or why. Motions with respect to this claim cannot be determined in the absence of a fuller factual record.

In this connection, the Court makes some observations with respect to this ruling and further proceedings. While in this Court's view it is immaterial whether the claims were denominated by the Committee as claims for breach of the Agreement or for breach of the covenant, any further proceedings on this claim for relief will henceforth be treated as claims for breach of contract, and the Agreement in particular, without prejudice to the rights of any party to call the Court's attention to any provisions of the Agreement that are arguably relevant.

In that connection, the Lenders have argued that the rights they exercised after the execution of the Agreement were specifically authorized under the Agreement, and that they cannot be faulted for availing themselves of rights they had negotiated for and obtained. They have called this Court's attention to Illinois authority, mentioned in part above, that parties to a contract "are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract," *Northern Trust Co. v. VIII South Michigan Assocs.*, 276 Ill.App.3d 355, 367, 212 Ill.Dec. 750, 657 N.E.2d 1095 (1st Dist. 1995) citing *Holtzman*, 248 Ill.App.3d at 113, 187 Ill.Dec. 827, 618 N.E.2d 418; that

---

good faith and fair dealing (Cmplt.¶¶ 156–163), to any pre-Agreement events, and the Court believes that it is inappropriate, and unfair to the Lenders, to expect them to defend on the possibility that some pre-Agreement acts might also be the basis of this

claim. Accordingly, the Court has no occasion to apply the *TIAA–LaSalle* holding where the court declined to enforce a covenant of good faith and fair dealing to an alleged oral agreement.

"[p]arties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith," *Holtzman,* 248 Ill.App.3d at 113, 187 Ill. Dec. 827, 618 N.E.2d 418; and that principles of good faith should be used only to fill the gap and should not be used to decide whether one party ought to have exercised privileges expressly reserved in a contract, citing *Kham & Nate's Shoes No. 2,* 908 F.2d at 1357. While there is authority to that effect and such may be the case, it is inappropriate to measure the propriety of the Lenders' post-Agreement acts, against that standard or any other, in the absence of the fuller factual record that this Court believes it needs to make determinations of that character.[149] In any further proceedings, whether on a motion under Rule 56 or at any trial on the merits, the Lenders will be free to make that point, but determinations with respect to this issue are inappropriate for resolution on a motion under Rule 12(b)(6).

### F. Bad Faith (Claim for Relief # 7)

In contrast to its claim for breach of the implied covenant of good faith and fair dealing, the Committee's claim for bad faith is premised upon both pre– and post-Agreement activity.

The essence of the pre-Agreement claim is that the Lenders "wrongfully secured a superior bargaining position through inducement and delay so that they were able to dictate the terms of the credit facility";[150] 'that it was essential for Lois to

have a replacement facility; that "Lois had no choice but to rely upon and place its confidence on the relationship with the [Lenders]"; that it "had every reason to rely on Green Tree's representations"; and that it was forced to accept the terms of the new credit facility.[151]

The claim insofar as it is based on post-Agreement conduct is essentially the same as the claim based on the implied covenant of good faith and fair dealing; the Committee alleges Lois' attempts to seek relief from the Lenders to remediate its financial crisis caused by the limited availability under the facility were futile, where the Lenders subsequently imposed greater restrictions and ultimately declared a technical default and ceased normal funding. By rejecting Lois' attempted resolutions, the Committee alleges that the Lenders acted indifferently, arbitrarily and capriciously in rejecting Lois' efforts "to work out an amicable resolution to the situation." [152]

There is an apparent conflict in the Illinois caselaw with respect to whether a violation of the implied covenant of good faith and fair dealing can be a tort, as contrasted to a contractual violation. The Lenders have cited several cases that hold, as the Lenders say they do, that Illinois does not recognize bad faith—sometimes articulated as a failure to proceed in good faith—as either a tort or an independent right of action. It "creates neither a cause of action sounding in tort nor its own *sui generis* cause of action." *Echo, supra,* 121 F.3d at 1106 (affirming dismissal of coun-

---

149. The same is true with respect to another principle cited by the Lenders, that Illinois courts will not permit implied agreements to overrule or modify the express contract of the parties, since "[e]xpress covenants abrogate the operation of implied covenants." *Holtzman,* 248 Ill.App.3d at 113, 187 Ill.Dec. 827, 618 N.E.2d 418.

150. Cmplt. ¶ 145.

151. Cmplt. ¶¶ 146–149.

152. Cmplt. ¶¶ 150–152. The Committee continues that the Lenders' course of dealings with Lois from the inception of their relationship with Lois—in other words, during both the pre– and post-Agreement phases, demonstrates that the Lenders "acted in bad faith." *Id.* ¶ 153.

terclaim for breach of implied covenant of good faith and fair dealing and stating such an argument was within a breach of contract claim and not standing alone as its own claim); *see also Chicago College of Osteopathic Med. v. Fuller Co.,* 719 F.2d 1335, 1348 (7th Cir.1983) ("[N]o Illinois case or statute supports a cause of action for bad-faith dealing outside the areas of insurance and employment law.").

Another of the cases cited by the Lenders, *Koehler v. First Nat'l Bank of Louisville,* 232 Ill.App.3d 679, 174 Ill.Dec. 49, 597 N.E.2d 1261 (5th Dist.1992), holds similarly, and has certain notable similarities to this case. There a trial court dismissed one of the causes of action in a complaint alleging that a lender failed to close on a loan to take advantage of a pro-lender market movement in interest rates, and took the action it did with the purpose of coercing plaintiffs to accept a higher rate of interest, 232 Ill.App.3d at 680–681, 174 Ill.Dec. 49, 597 N.E.2d 1261, holding that it failed to state a cause of action "recognized by the law of this state." *Id.* at 682, 174 Ill.Dec. 49, 597 N.E.2d 1261. The trial court ruled "[t]his is a contract case." *Id.* The appellate court affirmed. Contrasting cases in the insurance and employment retaliatory-discharge area (which had recognized rights of action of the character that the Committee would like to assert here), it held:

> In the absence of compelling policy considerations, we decline to extend the cause of action for bad-faith dealing to this area of the law. The trial court properly concluded that count V fails to state a cause of action cognizable in Illinois and rightly described the plaintiffs' cause as a contract action.

*Id.* at 683, 174 Ill.Dec. 49, 597 N.E.2d 1261. It further held:

> Care must be taken to prevent the transmutation of every breach of contract into an independent tort action through the bootstrapping of the general contract principle of good faith and fair dealing.

*Id.*

On the other hand, the Committee cites later Illinois authority that does indeed support its argument that the violation of the implied covenant of good faith and fair dealing—at least in the face of egregious facts—can be a tort. *See Voyles, supra,* 311 Ill.App.3d at 655–657, 244 Ill.Dec. 192, 724 N.E.2d 1276. There, one of Illinois' intermediate appellate courts was faced (after trial, and with full development of the facts) with some fairly egregious conduct by a bank mortgagee, with factual findings that the bank had unilaterally increased the amount that it could require, in its discretion, for the mortgage escrow deposits (thereby increasing a borrower's monthly payment); had refused tenders of payment on a loan; had used the resulting defaults to proceed with foreclosure; and had damaged the credit of the mortgagor, a homeowner, as well.

The *Voyles* court rejected the lender's argument that this conduct was at most a violation of contract, and that "the duty of good faith and fair dealing does not form the basis of a separate and independent tort recognized in Illinois," 311 Ill.App.3d at 655, 244 Ill.Dec. 192, 724 N.E.2d 1276. The *Voyles* court noted, to the contrary, that "recent decisions indicate that courts have implicitly accepted the existence of the tort of bad faith in lender-mortgagee scenarios." *Id.* It concluded that "contrary to defendant's assertion, Illinois courts have tacitly recognized the viability of such a claim," *id.* at 656, 244 Ill.Dec. 192, 724 N.E.2d 1276, and held that "plaintiff has proved her action in tort for breach of the duty of good faith and fair dealing." *Id.*

While *Voyles* did discuss, and distinguish, earlier Illinois caselaw, it did not discuss or try to reconcile its holding with *Echo, Fuller,* or *Koehler,* though this Court is hardly surprised that given the facts with which it was presented, the *Voyles* court found the bank's conduct to be not just a breach of contract, but tortious as well.

Attempting to harmonize these cases, this Court makes a number of observations. The first is that *Voyles,* while finding a tort and not just a breach of contract to have been established, considered the bad faith to exist in the context of the parties' performance of *an existing contract*—the loan agreement under which the homeowner had taken out the loan, some years before. While some of the language in *Voyles* was not so limited, the *Voyles* court clearly did not address the propriety of finding a duty of good faith and fair dealing in the absence of a contractual relationship between the parties; indeed, when it concluded that the tort had been established, the *Voyles* court expressly noted, in a parenthetical accompanying its citation of earlier Illinois authority, that the "gravaman of action is the arbitrary and capricious use of *contractually vested* discretion." *Id.* at 656, 244 Ill.Dec. 192, 724 N.E.2d 1276 (emphasis added).

■■■ *Echo, Fuller,* and *Koehler*—the earlier caselaw relied on by the Lenders—say there is no right of action at all, and while *Voyles* found such a right of action to exist, it did not do so in the absence of a pre-existing contract. This Court reads the combination of those earlier cases and

*Voyles* to support the view that under the proper facts, a claim for tort, and not just breach of contract, can exist under the law of Illinois, but only where there is already a contract upon which the duty of good faith and fair dealing can rest.

■■■ Here the Committee has not alleged the existence of a contract prior to the date of the execution of the Agreement, and its claims for contractual substitutes (e.g., promissory estoppel) have been determined to be foreclosed by the ICAA. This Court believes that it should be wary in imposing obligations on parties before they have consensually entered into contractual relations. Until they have imposed obligations upon themselves as part of a deal, parties may legitimately decide for themselves whether, and if so, when, they will enter into contractual relations. Where, as here, they expect to enter into detailed documentation down the road, they can, if they wish, enter into preliminary agreements—e.g., loan commitment agreements—which, at least under New York law, the courts will enforce if there has been the requisite contractual intent. *See, e.g., TIAA–Tribune, supra,* 670 F.Supp. 491 (enforcing a preliminary loan commitment agreement, finding that it created a contractual duty of good faith to negotiate final documentation consistent with economic terms of preliminary agreement). Lois and the Lenders could have entered into a binding commitment agreement imposing on each of them obligations of good faith, as was done in *TIAA–Tribune,* but the Committee has not alleged that such an agreement was executed.[153]

---

**153.** That distinguishes this case from another upon which the Committee relies, *Teachers Insurance & Annuity Ass'n of America v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986) (Weinfeld, J.) (*"TIAA–Butler"*), where, as the Committee noted in its parenthetical, "defendants breached their duty to negotiate in good faith

in connection with proposed loan transaction." (Committee Br. # 1 at 38 n.20). In *TIAA–Butler,* the lender and borrower had executed a written agreement, a loan commitment letter, which was, as acknowledged by the parties, a binding agreement between them. See 626 F.Supp. at 1230. It was in

In light of Illinois law such as *Koehler,* this Court believes that any pre-Agreement bad faith claim cannot stand. The Lenders' motions for dismissal of Claim # 7, Bad Faith, insofar as they relate to pre-Agreement conduct, are granted.

As noted, the Court believes that to the extent any tort claims can exist at all, they can lie only in the context of a then-existing contract, i.e., only with respect to the post-Agreement phase. Even then, however, the Court also notes some qualifications imposed by the *Voyles* court, which this Court considers relevant in determining the circumstances, if any, under which, with respect to the post-Agreement phase, the Committee might be able to show not just a contractual breach, but also a tort. The *Voyles* court stated:

> We note that the concern that the recognition of a tort of bad faith and unfair dealing will swallow ordinary breach of contract cases is minimal in this case. This case involved a homeowner.... Defendant then embarked on a course of action to force plaintiff into foreclosure by raising her monthly payments with no notice and then arbitrarily and capriciously refusing plaintiff's tender of amounts owing. Defendant's conduct was intentional and outrageous. In the future, in order to state a claim for bad faith, a defendant's conduct would have to be similarly egregious and outrageous.

*Id.* at 656, 244 Ill.Dec. 192, 724 N.E.2d 1276.[154] It thereafter laid out some guidelines for application of its holding in future cases, underscoring the importance, in the

*Voyles* court's thinking, of the fact that the plaintiff there was a homeowner, and the transaction involved a home mortgage:

> [P]laintiff was not a sophisticated developer; rather, she was a homeowner. Finally, we note that, like employment and insurance cases, this case concerns an area of great personal importance to any prospective plaintiff, namely her home mortgage. Thus, in our view, the wrongfulness of defendant's conduct, plaintiff's lack of choice in dealing with defendant, the inequality of plaintiff's position in relation to defendant, and the vital importance of plaintiff's interest in her home mortgage establish the hallmarks of any future bad faith claims arising from a lender's misconduct.

*Id.* at 657, 244 Ill.Dec. 192, 724 N.E.2d 1276.

Given that analysis, the Court has some uncertainty as to whether the Illinois courts would extend *Voyles* beyond a case involving a homeowner, and/or to a factual mix that did not present as many factors calling out for judicial relief as the facts in *Voyles* did. However, while we know even from the pleadings that at least two very significant factors in *Voyles* are missing—a plaintiff homeowner, and the "vital importance" of a homeowner's interest in her home mortgage—the record has not yet been fleshed out to enable the Court to determine the extent to which other "hallmarks" which the *Voyles* court considered significant could be shown to be present here, and the extent to which the Lenders

---

the context of that mutually acknowledged binding agreement—one that the defendants "concede[d] was binding on both parties, obligating them to borrow and plaintiff to lend," *id.* at 1232—that Judge Weinfeld found that the defendants had violated their duty of good faith and fair dealing.

**154.** In a further comment (whose significance, if any, the parties can debate down the road), the *Voyles* court made a contrast: "this is not a case in which a sophisticated real estate developer and a lender entered into an arm's-length agreement that did not pan out." *Id.* at 656–657, 244 Ill.Dec. 192, 724 N.E.2d 1276.

may have acted as egregiously as the bank did in *Voyles*.

As is apparent from the foregoing, the Court has some uncertainty as to whether *Voyles* properly could be extended to the commercial lending situation we have here, and whether, assuming that it could be, facts could be proven that would satisfy the very substantial showing that application of *Voyles* would require—requiring conduct that is "similarly egregious and outrageous." *Id.* at 656, 244 Ill.Dec. 192, 724 N.E.2d 1276. However, because application of *Voyles*, and determination of its limits, would necessarily be highly fact-specific, it would be inappropriate, under *Conley*, to dismiss the bad faith claim (regarding it as a claim in tort), insofar as it applies to post-Agreement conduct, on a motion under 12(b)(6). The Lenders' motions to dismiss this claim, insofar as it relates to post-Agreement conduct, are denied, without prejudice to renewal upon the development of a greater factual record down the road.

G. *Fiduciary Duty (Claim for Relief # 9)*

 Under the law of Illinois, which the Court has determined to be applicable to the fiduciary duty claim, a fiduciary relationship giving rise to a duty of loyalty owed to the person for whom the fiduciary is acting exists when one person places trust and confidence in another, who, as a result, gains influence and superiority over the other. *Kurtz v. Solomon*, 275 Ill.App.3d 643, 651, 212 Ill.Dec. 31, 656 N.E.2d 184, 190 (1st Dist.1995), *appeal denied*, 165 Ill.2d 552, 214 Ill.Dec. 859, 662 N.E.2d 425 (1996) (finding existence of fiduciary relationship between plaintiff and investing company). Such a relationship may be presumed from the relationship of the parties, such as between attorney and client, guardian and ward, and principal and agent, or may be found to exist by the facts of a particular situation, such as where one party places trust on another and there is resulting superiority and influence on the other party. *Farmer City State Bank v. Guingrich*, 139 Ill.App.3d 416, 422–423, 94 Ill.Dec. 1, 487 N.E.2d 758, 762–763 (4th Dist.1985); *Carey Electric Contracting, Inc. v. First Nat'l Bank of Elgin*, 74 Ill.App.3d 233, 237–238, 30 Ill.Dec. 104, 392 N.E.2d 759, 763 (2d Dist. 1979).

 The burden of pleading and proving the existence of a fiduciary relationship lies with the party seeking to establish it. *Farmer City State Bank*, 139 Ill.App.3d at 424, 94 Ill.Dec. 1, 487 N.E.2d 758; *Carey Electric Contracting*, 74 Ill.App.3d at 238, 30 Ill.Dec. 104, 392 N.E.2d 759 ("The existence of such a fiduciary relationship must be shown by proof so clear and convincing, so strong, unequivocal and unmistaken that it leads to only one conclusion."); *Northern Trust Co. v. Halas*, 257 Ill. App.3d 565, 571, 195 Ill.Dec. 850, 629 N.E.2d 158, 164 (1st Dist.1993) (affirming lower court and finding allegations insufficient to support existence of fiduciary relationship).

 Under the law of Illinois, the relationship between a borrower and lender does not create a fiduciary relationship. *TIAA–LaSalle, supra*, 295 Ill.App.3d at 71, 229 Ill.Dec. 408, 691 N.E.2d 881 ("A mortgagor-mortgagee relationship does not create a fiduciary relationship as a matter of law."); *Northern Trust*, 257 Ill.App.3d at 572, 195 Ill.Dec. 850, 629 N.E.2d 158 (same); *Santa Claus Industries v. First Nat'l Bank of Chicago*, 216 Ill.App.3d 231, 238, 159 Ill.Dec. 657, 576 N.E.2d 326, 330 (1st Dist.1991) ("As a general rule, a fiduciary relationship does not exist between a guarantor-creditor or between a debtor-creditor as a matter of law."). As a more general matter, "the normal trust between

contracting parties does not operate to turn a formal, contractual relationship into a fiduciary relationship unless one of the parties places great trust in and relies heavily on the judgment of the other party." *TIAA–LaSalle,* 295 Ill.App.3d at 71, 229 Ill.Dec. 408, 691 N.E.2d 881 (finding no factual basis to support such a relationship).

Thus, where, as here, an alleged fiduciary relationship does not exist as a consequence of the lender-borrower relationship, the party claiming such a relationship exists must plead facts from which a fiduciary relationship otherwise can be found. *See Farmer City State Bank, supra,* 139 Ill.App.3d at 424, 94 Ill.Dec. 1, 487 N.E.2d 758 (facts to support a fiduciary relationship must be pleaded and proved by clear and convincing evidence); *Northern Trust,* 257 Ill.App.3d at 571–572, 195. Ill.Dec. 850, 629 N.E.2d 158; *Carey,* 74 Ill.App.3d at 238, 30 Ill.Dec. 104, 392 N.E.2d 759 (businesses linked by contract can be found to be parties in a confidential relationship, but mere allegations that one trusted the other to fulfill his contractual obligations are not enough). For example, the party seeking to establish the existence of a fiduciary relationship must show that he placed trust and confidence in another so that the other gained influence and superiority over him, where the degree of trust and confidence can be shown by factors such as degree of kinship, age disparity, health, mental condition, education, business experience, and extent of reliance. *Santa Claus Industries,* 216 Ill.App.3d at 238, 159 Ill.Dec. 657, 576 N.E.2d 326 (recognizing a fiduciary relationship can exist between a guarantor-creditor under certain circumstances but concluding nothing more than a debtor-creditor relationship was alleged in the complaint); *Farm-*

*er City State Bank,* 139 Ill.App.3d at 424, 94 Ill.Dec. 1, 487 N.E.2d 758 (finding no fiduciary relationship where above-mentioned factors were not present).

However, the Complaint is lacking in the allegations necessary to establish a fiduciary relationship. There are no allegations that Lois placed special trust and confidence in the Lenders to warrant a finding of a fiduciary relationship;[155] indeed, other than a conclusory assertion that the Lenders' alleged exercise of improper control over Lois in the post-Agreement phase "created an additional fiduciary relationship,"[156] there are no allegations of the existence of the fiduciary duty in the first place. While the Court does not rule out the possibility that facts might be alleged, in some other case, to show sufficient domination and control by a lender (possibly by representation on the borrower's board of directors, decisions as to hiring and firing, decisions as to the dispositions of assets, and/or as to the shutdown of any lines of business), allegations of that character are lacking here.

Then, and as significantly or more so, any claim of the existence of fiduciary duty as a result of course of dealings is contradicted by the Agreement itself. Loan Agreement § 10.2 provides, in relevant part:

> No provision contained herein or in any other Financing Agreement and no course of dealing between the parties shall be deemed to create any fiduciary relationship between the Agent or any Lender and the Borrowers....

*Id.; accord* Loan Agreement § 10.19.

The Court is not free to disregard such a clear and unequivocal provision, particularly in the absence of any showing as to

---

**155.** *See* Cmplt. ¶¶ 164–180.

**156.** Cmplt. ¶ 169. "Additional" to what is not stated.

why such a provision should be disregarded, or any showing how, in spite of such language, a fiduciary duty nevertheless should be found to exist. Claim # 9, for breach of fiduciary duty, is dismissed.

### H. Equitable Subordination (Claim for Relief # 3)

▆▆▆▆ The doctrine of equitable subordination, codified, in part, under Section 510(c) of the Bankruptcy Code,[157] empowers a bankruptcy court to subordinate, for purposes of distribution, claims to other claims, or interests to other interests, and to transfer the lien securing the subordinated claim to the estate. *See In re 80 Nassau Assocs., supra,* 169 B.R. at 836–837. Section 510(c) implements the Supreme Court's seminal decision under the former Bankruptcy Act in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). It permits a bankruptcy court to consider whether "notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in relation to other creditors is or was such that it would be unjust or unfair to permit the claimant to share pro rata with the other claimants of equal status." *In re 80 Nassau Assocs.,* 169 B.R. at 837, quoting Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Business Lawyer 417, 419 (1985) ("*DeNatale & Abram* ").[158]

The parties agree that the propriety of equitable subordination is a matter of federal, and not state, law. They also agree that in considering the propriety of equitable subordination, courts generally apply the three prong test first set forth in *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977),[159] even though *Mobile Steel,* like *Pepper v. Litton,* was a case under the former Act.[160]

▆▆▆ *Mobile Steel* sets forth a three-part standard for determining whether eq-

---

**157.** That section provides that notwithstanding sections 510(a) and 510(b), of the Code (relating to subordination agreements and the subordination of damage claims arising from the rescission of purchases or sales of securities):

> [A]fter notice and a hearing, the court may—
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510.

**158.** However, the equitable subordination doctrine is limited to reordering priorities and does not permit disallowance of claims. *Id.* It provides a mechanism apart from the disallowance that might be appropriate for other reasons, such as ordinary contract defenses resulting from the claimant's material breach.

**159.** *See* Comm. Br. # 1 at 27 (citing to *Mobile Steel* and *80 Nassau Assocs., supra,* which had

laid out and applied the *Mobile Steel* factors); Green Tree Br. # 1 at 9–10 (citing to *In re Granite Partners, L.P., supra,* 210 B.R. 508, which likewise had laid out and applied the *Mobile Steel* factors).

**160.** While the authority to impose equitable subordination is expressly set out in the Code, the standards for the imposition of equitable subordination are not; instead, Congress intended that they be defined by existing case law. *See DeNatale & Abram,* 40 Bus. Law. at 421 ("The drafters of the Code saw fit to codify the principle of equitable subordination, yet left the delineation and development of the doctrine to the courts."). Pre–Code cases interpreting the doctrine remain authoritative. *See 80 Nassau Assocs.,* 169 B.R. at 837 n. 3. *Mobile Steel's* three prong analysis "has been widely adopted by courts as the proper test for equitable subordination under 510(c)." *Herzog v. Leighton Holdings (In re Kids Creek Partners, L.P.),* 200 B.R. 996, 1014 (Bankr.N.D.Ill.1996), *aff'd,* 239 B.R. 497 (N.D.Ill.1999).

uitable subordination is appropriate—whether: (a) the claimant engaged in some type of inequitable conduct; (b) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (c) equitable subordination of the claim is consistent with bankruptcy law. *See* 563 F.2d at 700; *80 Nassau Assocs.*, 169 B.R. at 837; *Granite Partners*, 210 B.R. at 514.

The Lenders attack, in particular, the first of the three prongs, arguing that there are insufficient allegations that they engaged in any (or sufficient) inequitable conduct.[161] Each points out that application of the equitable subordination doctrine has been limited to cases involving (1) fraud, illegality or breach of fiduciary duty; (2) undercapitalization; or (3) control or use of the debtor as an alter ego for the benefit of the claimant. *See Granite Partners*, 210 B.R. at 514; *80 Nassau Assocs.*, 169 B.R. at 838. They then argue that, except for breach of fiduciary duty, none of the foregoing has been alleged, and that the fiduciary duty which was a predicate for this claim (like two of the other claims asserted by the Committee) was lacking.[162] The Committee has responded, in turn, by arguing that the Lenders did have a fiduciary duty, that was breached;[163] that, even in the absence of a fiduciary duty, the Committee's other claims, for "fraud, unjust enrichment, etc." meet the test for inequitable conduct;[164] and that, in the post-Agreement phase, the Lenders exercised a degree of control over Lois and engaged in other acts for their advantage that also met the standards for establishing inequitable conduct.[165]

**161.** *See* GECC Br. # 1 at 29–30 (former); Green Tree Br. # 1 at 9 (latter).

**162.** *See* GECC Br. # 1 at 30, Green Tree Br. # 1 at 9. GECC also argues that it "does not have any claims pending before the Bankruptcy Court" (GECC Br. # 2 at 35), and that, presumably for that reason, "the principles of equitable subordination are irrelevant to this action." *Id.* (citing *New Jersey Steel Corp. v. Bank of New York*, 223 B.R. 406, 415 (S.D.N.Y.1998) (Pollack, J)). However, as the Committee notes (Comm. Br. # 2 at 10), the creditor in *New Jersey Steel Corp.* had never asserted a claim against the debtor. Indeed, *New Jersey Steel Corp.* involved a suit by one creditor against another, involving the latter's failure to honor its contract to share the proceeds of a collateral liquidation, and the suit would have no effect on the underlying debtor's bankruptcy case at all. *See id.* at 407, 414. The *New Jersey Steel Corp.* court had noted that equitable subordination was a remedy peculiar to the equitable jurisdiction of the Bankruptcy Court, *id.* at 414—a hardly remarkable proposition that is not relevant here.

If GECC bases its argument on the fact that the Lenders now have been paid off, the Court does not find such an argument persuasive. If a lender once had the status of a creditor and was paid off during the course of a case based on the belief of the Court and parties-in-interest at the time that the creditor was secured and/or otherwise entitled to payment without subordination, and facts and/or conclusions of law later resulted in the conclusion that the imposition of equitable subordination was otherwise warranted, the Court believes that (particularly as a court of equity applying an equitable doctrine), it would have ample power to afford appropriate relief. *See DeNatale & Abram*, 40 Bus. Law. at 428 ("If the bankruptcy court determines that ... the application of the doctrine of equitable subordination is appropriate in a particular case, the court generally may order any relief that it deems appropriate to undo the wrong and ensure that the liquidation results are equitable. This relief can include ... directing the return of improper payments made prior to the commencement of the case...."). This Court believes that, for the very same reasons, it can do so after the commencement of the case as well.

**163.** *See* Comm. Br. # 1 at 28.

**164.** Comm. Br. # 1 at 28.

**165.** Comm. Br. # 1 at 28–29 ("Like the lenders in the cases cited above, the Lenders here exercised significant control over the Debtors

Without question, cases of this character are fact intensive.[166] Nevertheless, substantial caselaw has developed in this area, both in this District and elsewhere, laying out standards for when imposition of equitable subordination is appropriate.

▬ As relevant here, that caselaw establishes that:

Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, inter alia, a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.

*80 Nassau Assocs.*, 169 B.R. at 837 (quoting *In re Tampa Chain Co.*, 53 B.R. 772, 779 (Bankr.S.D.N.Y.1985)) (other citations omitted).

▬ As Judge Bernstein noted in *80 Nassau Associates,* traditionally equitable subordination did not apply to ordinary creditors, as contrasted to insiders. *See* 169 B.R. at 838. Now the doctrine is also applicable to general creditors, *id.,* but "cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between." *Id.* (quoting *In re Kham & Nate's Shoes No. 2, supra,* 908 F.2d at 1356). That is un-

doubtedly so, in substantial part, because the opportunities for abuses that trigger equitable subordination tend to be more readily available to insiders. It also is so, no doubt, because "[t]he average general creditor does not owe a fiduciary duty to the debtor or the creditors of the debtor in the collection of its claim." *80 Nassau Assocs.,* 169 B.R. at 838. As the Second Circuit held in a case under the former Act:

A creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim... The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make future loans needed by the debtor, to improve the status of his existing claims.

*In re W.T. Grant Co.,* 699 F.2d 599, 609–610 (2d Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

Recognizing that traditionally, equitable subordination had been limited to cases involving the three circumstances described above—(1) fraud, illegality or breach of fiduciary duty; (2) undercapitali-

---

as evidenced in their direction to slow down payments to trade vendors in order to pay [the Lenders'] loan down, padding the loan with soft costs like duplicative audit and professional fee costs and in the disposition of Fogarty & Klein.") (footnote omitted).

**166.** It has been said that the "inequitable conduct" required for equitable subordination is a "very slippery concept with little predictive value," *80 Nassau Assocs.,* 169 B.R. at 837 (quoting 2 David G. Epstein et al., Bankruptcy, § 6–93 at 256 (1992)), and that identifying the degree of inequitable con-

duct justifying equitable subordination to general creditors, as opposed to insiders, "has proven even more 'slippery' and unpredictable." *Id.* at 838. Nevertheless, "[t]he prerogative to relegate claims to inferior status on equitable grounds, though broad, ... is not unlimited." *Mobile Steel,* 563 F.2d at 699 (citations omitted). Like many areas of the law, the caselaw in this area provides some objective standards, and this Court has the luxury of cases like *80 Nassau Associates* and *Granite Partners* applying them to factual allegations, like ours, seeking equitable subordination of a non-insider.

zation; or (3) control or use of the debtor as an alter ego for the benefit of the claimant, *Granite Partners,* 210 B.R. at 514; *80 Nassau Assocs.,* 169 B.R. at 838— Judge Bernstein noted:

> [I]t is not enough to allege simply that the defendant engaged in "inequitable conduct"; the party seeking equitable subordination must allege conduct that fits within one of these three paradigms.

*Granite Partners,* 210 B.R. at 515 (citing *In re After Six, Inc.,* 177 B.R. 219, 232 (Bankr.E.D.Pa.1995)). He further noted that courts had described the degree of wrongful conduct warranting equitable subordination of an ordinary creditor's claim as "gross and egregious," "tantamount to fraud, misrepresentation, overreaching or spoliation" or "involving moral turpitude." *Id.*

██ After describing the equitable subordination cases at length in *80 Nassau Associates,* Judge Bernstein then observed:

> It appears, therefore, that there is no different or heightened standard to judge a non-insider/non fiduciary's conduct; there are just fewer traditional grounds available.... Neither undercapitalization nor breach of fiduciary duty applies. Thus, unless the claimant controls the debtor, and exercises that control to gain an unfair advantage, the proponent of equitable subordination must show wrongful conduct involving fraud, illegality or some other breach of a legally recognized duty.

169 B.R. at 839. He thereafter stated:

> Hence, the standard of inequitable conduct that justifies subordination of a non-insider/non-fiduciary's claim can be summarized in the following manner: unless the creditor has dominated or controlled the debtor to gain an unfair advantage, his claim will be subordinated, based upon inequitable conduct, only

if the claimant has committed some breach of an existing, legally recognized duty arising under contract, tort, or other area of law. In commercial cases, the proponent must demonstrate a substantial breach of contract and advantage-taking by the creditor.... In the absence of a contractual breach, the proponent must demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity.

*Id.* at 840. The standard to be applied here was concisely stated in *Granite Partners:*

> Accordingly, to survive a motion to dismiss an action to equitabl[y] subordinate an ordinary claim, the plaintiff must "allege facts showing fraud, illegality or breach of some other legal duty owing by [the defendant creditor] to the Debtors or their creditors."

*Id.* at 515; *accord 80 Nassau Assocs.,* 169 B.R. at 841.

Upon review of the Committee's allegations in this legal context, the great bulk of them do not state a claim for equitable subordination. For the reasons stated in connection with the negligent misrepresentation and breach of fiduciary duty claims, discussed above, and the holdings in *W.T. Grant* and *80 Nassau Associates* here, the Lenders did not owe a fiduciary duty to Lois, and the Committee's effort to equitably subordinate based on that premise cannot stand. The Committee has not alleged undercapitalization, which, as previously noted, is inapplicable to an effort to equitably subordinate a non-insider. The Committee's reference to "fraud, unjust enrichment, etc." paints with too broad a brush; the Committee's other pleaded claims provide a potential basis for equitable subordination only to the extent that the Committee can establish liability on the non-dismissed claims of fraud or a

contractual violation of the implied covenant of good faith and fair dealing.[167]

■ Finally, the Committee has argued in its briefs that in the post-Agreement phase, the Lenders exercised a degree of control over Lois and engaged in other acts for their advantage that also met the standards for establishing inequitable conduct.[168] A non-insider's exercise of control over a debtor's operations, where that control is exercised in a manner to benefit that non-insider at the expense of other creditors,[169] where a non-insider makes major decisions for the borrower (such as hiring and firing, the release of claims, and the filing of a bankruptcy petition),[170] and/or where it determines which bills would be paid,[171] may, under certain circumstances, provide a basis for equitable subordination when that basis otherwise would be lacking, but such allegations appear only in the Committee's briefs, and not in the Complaint.[172] Indeed, such allegations are conspicuously absent from the Complaint, and there are other allegations in the Complaint that could be argued to be inconsistent with such an allegation.[173]

167. The Court is not making a substantive determination at this time with respect the extent to which such claims, after the facts have been developed, will support equitable subordination; as a matter of pleading, the Court finds that such allegations, if they or some variant of them are proven, may justify equitable subordination, and once more, under *Conley,* dismissal under Rule 12(b)(6) is inappropriate.

168. Comm. Br. # 1 at 28–29; Comm. Br. # 2 at 10–11. One of these alleged acts of exercise of control was knowingly sweeping bank accounts which had in them funds paid by advertisers to Lois "for the benefit of and possibly held in trust for" the media creditors. (Comm. Br. # 2 at 11 n.5).

169. *See 80 Nassau Associates,* 169 B.R. at 840, whose relevant language was quoted above; *DeNatale & Abram,* 40 Bus. Law. at 424–425 ("Once a creditor assumes control over a debtor's operations, it assumes a duty to deal fairly with the debtor and its creditors, and its conduct is subjected to the scrutiny of the court."). However, "[t]he control goes only to establishing a duty. In order to subordinate equitably a creditor's claim, the control must be coupled with the use of that control to the creditor's advantage and to the other creditors' detriment." *DeNatale & Abram,* 40 Bus. Law. at 432.

170. *In re Aluminum Mills Corp.,* 132 B.R. 869, 895 (Bankr.N.D.Ill.1991) (holding that allegations of this character were sufficient to withstand a motion to dismiss). GECC notes (GECC Br. # 1 at 34) that the decision in *Aluminum Mills* was rejected by the court in *Boyd v. Sachs (In re Auto Specialties Mfg. Co.),* 153 B.R. 457, 481 (Bankr.W.D.Mich.1993), *aff'd,* 1994 U.S. Dist. LEXIS 8435 (W.D.Mich. Apr. 11, 1994). On this record, this Court considers it inappropriate to consider which of those views would be more appropriate for application in this case.

171. *Bergquist v. First Nat'l Bank of St. Paul (In re American Lumber Company),* 5 B.R. 470, 474 (D.Minn.1980).

172. The closest the Committee comes to such an allegation in the Complaint is its statement, in two places, that the Lenders *"advised* Lois to defer payment on its account payables so as to make payments only when absolutely necessary." (Cmplt.¶¶ 58, 129) (emphasis added). Whether this was a command or merely advice was not stated in the Complaint; the Committee stated in briefing on the motions, however, that the "Lenders *caused* the Debtors to stretch out the payments to trade vendors and *supervised* to whom payments should be made," and that "[w]hile the Lenders were using the Debtors' cash receipts to pay down their loan, the Debtors were asked to 'ride' their trade creditors, particularly the media, to continue operations." (Comm. Br. # 1 at 45) (emphasis added).

173. *See* Cmplt. ¶ 70 ("In light of the financial crisis, *Lois management* determined that the most appropriate steps would be to halt all payments except for those to [Fogarty & Klein, a profitable subsidiary that might have value if sold], for the purpose of saving the value of that enterprise.") (emphasis added).

Even so, the Court is loath to deny the Committee the opportunity to show matters of the type described in the preceding paragraph to the extent they can be shown. Fairness to the Lenders requires, however, that if the Committee is to rely on allegations of that character to support equitable subordination, the Complaint be amended to lay out exactly what the Committee undertakes to prove. If the Committee can make such allegations, the Court will permit the Committee to do so. While amendment of the Complaint to make such allegations will be required, leave to do so is granted.

■ For the foregoing reasons, Claim # 3, for equitable subordination, is dismissed to the extent it relies on any theories other than fraud on the part of the Lenders and breach of the implied covenant of good faith and fair dealing. If the Committee wishes to base equitable subordination on the Lenders' exercise of control over Lois operations to the detriment of other creditors, the Committee shall amend the Complaint to make the factual allegations upon which equitable subordination under that theory is based. Leave to amend for that purpose is granted.[174]

## IV.

### Fed.R.Civ.P. Rule 9(b) Issues

Each of the Lenders also moves for dismissal under Fed. R. Bankr.P. 7009, and Fed.R.Civ.P. 9(b), which is made applicable to adversary proceedings such as this one. Rule 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The fraud claims subject to this rule are set forth in Claims # 4 (fraudulent misrepresentation) # 5 (fraud); and # 6 (negligent misrepresentation); the last of these has likewise been held to warrant treatment as a fraud claim. *See Loewy v. Stuart Drug & Surgical Supply, Inc.,* 1999 WL 76939, at *6 (S.D.N.Y.1999); *Pilarczyk v. Morrison Knudsen Corp.,* 965 F.Supp. 311, 323 (N.D.N.Y.1997), *aff'd,* 162 F.3d 1148 (2d Cir.1998).

The Second Circuit has spoken with respect to the requirements of Fed.R.Civ.P. 9(b). *See Olsen v. Pratt & Whitney Aircraft,* 136 F.3d 273 (2d Cir.1998); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); the parties agree on the applicability of Rule 9(b) and those Second Circuit cases interpreting it, but differ with respect to the extent to their respective requirements have been satisfied.

*Olsen* states, in relevant part:

[W]hen a complaint charges fraud, it must (1) detail the statements ... that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements ... were made, and (4) explain why the statements ... are fraudulent.

136 F.3d at 275 (ellipsis in original). *Cosmas* is to the same effect. The Creditors' Committee does not dispute that, but notes authority explaining the application of those principles:

[P]laintiff is not required to plead the date, time and place "with the detail of a

---

**174.** In light of the discussion above, the Court believes that if the Complaint is so amended, any further motions to dismiss it under Rule 12(b)(6) would not represent a good use of lawyers' and judicial resources. If the Complaint is so amended and the Lenders are so advised, they can, after the facts are developed, bring up for the Court's consideration any remaining issues with respect to equitable subordination claims in motions under Rule 56 or thereafter.

desk calendar or street map" provided that he gives the defendant fair and reasonable notice of the claim and the grounds on which it is based.... The adequacy of the information will depend, *inter alia,* on the length of the time over which the misrepresentations were supposedly made and the number of persons who supposedly made them.

*In re Matterhorn Group, supra,* 2000 WL 1174215 *4 (quoting *International Motor Sports Group, Inc. v. Gordon,* 1999 WL 619633, *3–4 (S.D.N.Y. Aug.16, 1999) (Mukasey, C.J.)).

As Chief Judge Mukasey put it in *International Motor Sports Group,* notwithstanding the use of the word "must" in the Second Circuit's caselaw setting out Rule 9(b) requirements, "it is well established that 'there is no bright line rule for deciding whether a complaint has satisfied Rule 9(b).'" *Id.* at *3. Indeed, in analyzing the sufficiency of a pleading under Rule 9(b), this Court, like the District Court, must balance the rule with both Fed.R.Civ.P. 8(a), which requires only a "short and plain statement" of the claims for relief, and Fed.R.Civ.P. 8(f), which provides that "all pleadings shall be so construed as to do substantial justice." *Id.*

It also has been held that a court must read the complaint generously and draw all inferences in favor of the pleader, *see Bharucha v. Reuters Holdings PLC,* 810 F.Supp. 37, 40 (E.D.N.Y.1993); *Pereira v. Centel Corp. (In re Argo Communications Corp.),* 134 B.R. 776, 792 (Bankr.S.D.N.Y. 1991), and (in comments particularly relevant where litigation is commenced by a trustee or creditors' committee, in contrast to the debtor itself) that the court can take into account the investigation available to the plaintiff at the stage in the proceeding, and in particular, the extent of access to information that the plaintiff had, including the plaintiff's access to discovery. *See J.*

*Baranello & Sons, Inc. v. Baharestani (In re J. Baranello & Sons, Inc.),* 149 B.R. 19, 29 (Bankr.E.D.N.Y.1992) (complaint contained sufficient detail for pre-discovery pleading); *In re Argo Communications,* 134 B.R. at 793 (complaint sufficiently stated fraud claim, containing as much detail as could be expected before discovery, where the defendant was alleged to have concealed its motives).

In *Matterhorn Group,* Judge Bernstein of this Court noted Rule 9(b)'s purpose:

> Rule 9(b), made applicable to this adversary proceeding by Fed.R.Bankr.P. 7009, is designed to provide a defendant with fair notice of the plaintiff's claim, safeguard the defendant's reputation from improvident charges of wrongdoing and protect against strike suits.

2000 WL 1174215 at *4. The Court views Judge Bernstein's observations as to Rule 9(b)'s purpose to be of significance in determining whether Rule 9(b) compliance was sufficient.

Insofar as relevant to the Rule 9(b) motions, the facts as to the two Lenders are materially different. As alleged in the Complaint, all but one of the pre-Agreement communications to Lois that are alleged to provide the basis for the alleged fraud and misrepresentations were made by Green Tree, rather than GECC, and the one statement that was made by GECC is not alleged to be fraudulent. It therefore is necessary to consider the fraud and misrepresentation allegations as to the two defendants separately.

Fraud allegations with respect to Green Tree include those that:

> [I]n mid February, 1999, Christopher Gouskos of Green Tree informed Lois at that time that Green Tree would put together a $45 million facility that would be structured under substantially similar

terms as the existing credit facility between Sanwa and Lois.

Cmplt. ¶ 32; *accord id.* ¶ 96, and that

This information was conveyed either during a telephone conversation between Mr. Gouskos of Green Tree in Atlanta, Georgia and Lois' New York office or on a visit to Lois' New York headquarters.

*Id.* The Committee further alleges that those representations were made with reckless disregard as to their truth or falsity, or knowledge that the representations were false, in that Green Tree had no intention of entering into a facility of that size or under those terms with Lois.[175]

While it may be difficult for the Committee to ultimately make the factual showing that Gouskos had no intention of doing what he allegedly said he would do, and/or for the Committee otherwise to meet the high standards of proof with respect to promissory fraud, that is not a Rule 9(b) issue. Judge Mukasey noted in *International Motor Sports Group* that "a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.'" 1999 WL 619633 at *3 (citing *Spear, Leeds & Kellogg v. Pub. Serv.,* 700 F.Supp. 791, 793 (S.D.N.Y. 1988)). It is not terribly important, in this Court's view, to determine exactly what day or days in February 1999 Gouskos made the statements he did to Lois, in order for Green Tree to defend, especially since Green Tree's counsel knows who to talk to, whose files to examine, and whose

date book it can consult. This Court has little doubt that the Committee has made clear the substance of its fraud claims, and has given Green Tree what it needs to defend itself from the Committee's allegations. Green Tree's motion under Rule 9(b) to dismiss Claims # 4, # 5 and # 6, for fraudulent misrepresentation, fraud, and negligent misrepresentation, respectively, is denied.[176]

In contrast, however, the Court understands the difficulties GECC faces in defending itself from the fraud allegations of the Complaint. As pleaded, all of the misrepresentations and/or acts constituting fraud were made by Green Tree, not GECC, but the Committee is attempting to hold GECC responsible for Green Tree's acts. Green Tree became GECC's agent under the Agreement upon the closing in June 1999, but review of the Complaint has revealed no pleaded basis for an agency prior to that time, and especially in the February–March period, when all or substantially all of the alleged fraud and misrepresentations took place.[177]

Possibly to get around this, the Committee has pleaded:

GE[CC] was not a passive participant in the loan. Specifically, GE[CC] served as audit agent under the loan agreement; GE[CC] conducted its own comprehensive audit of Lois prior to the extension of the loan; GE[CC] monitored the loan; GE[CC] auditors made frequent and eventually daily visits to Lois' offices to review documentation; GE[CC] frequently inquired as to Lois'

---

**175.** Cmplt. ¶ 98.

**176.** However, as noted above, dismissal of the claim for negligent misrepresentation is granted on the merits. *See* pages 115–16 et seq.

**177.** The Court is aware that the Committee has alleged that "[a]t the time that Green Tree

made certain of these representations, Green Tree was acting on its own behalf and as agent of GE, its principal." *See* Cmplt. ¶ 97; *accord* ¶¶ 112, 134. However, there are no facts pleaded supporting the alleged agency before June, 1999, and the Court believes that a conclusory allegation of that character cannot fairly be held to satisfy Rule 9(b).

receivables, revenue and expenses; GE[CC] participated on calls with Green Tree to Lois regarding the loan; weekly reports on collections and payments were provided to GE[CC], and in or about September of 1999, GE[CC] demanded daily reports. (Cmplt.¶ 58). Those allegations, however, fall short of alleging either the making or authorization of any misrepresentations, or an agency before the execution of the Agreement. The Court has been unable to find any allegation that GECC made any false statement to Lois; made Green Tree GECC's agent prior to the June closing; or provided any other actual or alleged basis for holding GECC liable for Green Tree's acts.

This Court considers that the benchmark articulated by Judge Mukasey (and which this Court found appropriate for application and to be satisfied with respect to Green Tree), quoted above, is no less appropriate for application here, and not satisfied with respect to GECC. The Complaint having failed, with respect to the fraud claims asserted against GECC, to "give[ ] fair and reasonable notice to defendants of the claim and the grounds upon which it is based," the remaining fraud claims are dismissed under Rule 9(b) with respect to GECC.

## V.

### Further Proceedings

As is apparent from the foregoing, the Court has dismissed much of the Commit-

tee's case, but not all of it. The Court recognizes, however, that (particularly by reason of the dismissal of the promissory estoppel, negligent misrepresentation and fiduciary duty claims, and the difficulties in proof with respect to the claims that remain) this decision presents the Committee with considerable practical difficulties in going forward, and may not differ materially in practical effect from a dismissal of all of the claims.

Under the circumstances, the Court believes that it is appropriate that the Committee have the opportunity for prompt appellate review of this ruling, and that such review should not be denied or delayed by reason of this Court's failure to dismiss the remaining claims. Accordingly, this Court determines, pursuant to Fed. R.Civ.P. 54(b),[178] that "there is no just reason for delay," and expressly authorizes and directs that a separate judgment be entered on this Decision providing for the dismissal of the claims dismissed by the Court as provided in this decision, which shall be a final judgment.

Discovery with respect to the non-dismissed claims shall go forward, in this Court's discretion, in the interest of expediting the ultimate determination of this case if this Court's rulings are affirmed.

Counsel for the parties are directed promptly to confer and agree, if possible, on an order (with respect to all of the

---

**178.** Fed.R.Civ.P. 54(b), as made applicable to adversary proceedings by Fed. R. Bankr.P. 7054(a), provides, in relevant part:

When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of

judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

claims, both dismissed and non-dismissed) and a separate judgment, with respect to the dismissed claims, implementing this decision. In the event of an inability to agree, after good faith efforts in this regard, any party may settle the order and/or judgment on 5 business days' notice by hand or fax. The time to appeal (and, to the extent applicable, with respect to any interlocutory rulings, the time to request leave to appeal) shall run from the entry of the judgment and order, respectively, and not this decision.

The Court's Courtroom Deputy will advise the parties of a date for a conference, pursuant to Fed.R.Civ.P. 16 (made applicable to adversary proceedings under Fed. R. Bankr.P. 7016) at which the Court will consider, among other things, any further amendments to the Complaint; answers by the Lenders; and the commencement and completion of discovery.